## Watson Appeal.

Argued November 22, 1972. Before JONES, C. J., EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

reargument refused April 10, 1973.

*Grace C. Kennedy,* for appellant.

*Peter M. Mattoon,* with him *Charles J. Peischl,* and *Ballard, Spahr, Andrews & Ingersoll,* for appellee.

OPINION BY MR. CHIEF JUSTICE JONES, March 16, 1973:

On December 12, 1968, appellant gave birth to Stephanie Watson at the Presbyterian Hospital in Philadelphia. Appellant was then an unmarried fourteen-year-old tenth grade student at the Gratz Neighborhood High School. The acknowledged father, who was sixteen years old on the date of the infant's birth, is Leon Van Randolph, Jr.

On December 23, 1968, appellant relinquished custody of her infant daughter to the Children's Aid Society of Philadelphia. On April 7, 1969, appellant signed a petition for the voluntary relinquishment of parental rights in the infant Stephanie. Appellant and her mother, Mrs. Janet Watson Bull, attended a hearing before the Honorable Hazel H. BROWN on April 30, 1969, pursuant to the petition for relinquishment. Appellant and her mother each offered testimony attesting to an understanding of the relinquishment proceeding and the finality of their decision.[1] The petition for relinquishment was thus granted according to the Adoption Act of April 4, 1925, P. L. 127, §1.1, *as amended,* 1 P.S. §1.1,[2] *repealed,* Act of July 24, 1970, P. L. 620, §601, 1 P.S. §601.

---

[1] "THE COURT: Do you realize if this petition is granted, you forever give up all your rights to the baby? APPELLANT: Yes. THE COURT: The Children's Aid Society will then have the right to place her in a home for adoption and when there is a hearing on that petition, they will have the right to consent without any notice to you? APPELLANT: Yes. THE COURT: And do you agree to that? APPELLANT: Yes. . . . THE COURT (to Mrs. Janet Watson Bull, appellant's mother) : Do you approve of having this baby placed for adoption? ANSWER: Yes."

[2] Section 1.1 of the prior Act providing for voluntary relinquishment read, in pertinent part, as follows:

From April 30, 1969, until January 1971, when appellant petitioned the lower court to vacate the decree of voluntary relinquishment, neither appellant nor her mother manifested any misgivings about the relinquishment decision. On January 26, 1971, appellant filed a petition to vacate the order of relinquishment. Judge BROWN held an evidentiary hearing on June 30, 1971, and on November 3, 1971, entered an order dismissing the petition to vacate the decree of relinquishment. Denise Watson Randolph[3] has appealed from the order dismissing the petition to vacate.[4]

Appellant questions whether the relinquishment of her child was a voluntary, intelligent and deliberate act and whether the procedure employed pursuant to appellant's voluntary relinquishment afforded her procedural due process guaranteed by the Constitution.

---

"When any person under the age of eighteen years has been in the care of an approved agency or institution for a minimum period of five (5) days, the parent or parents of such person may petition the court . . . for permission to relinquish forever all parental rights to such person. . . .

"The court shall thereupon fix a time for hearing. . . . At such hearing, the court, by examination under oath of the parties to the petition, shall ascertain the truth of the facts set forth in the petition and its execution, and if satisfied as to the truth thereof and that the petition should be granted, it shall issue its decree so finding, and (1) directing the transfer of the custody of the person to the approved agency or institution, and (2) authorizing such agency or institution to give consent to the adoption of such person without further consent of or notification to the parent or parents."

The procedure followed by the court below, pursuant to Section 1.1 of the former adoption act, is substantially reenacted in Sections 301, 303 and 321 of the Adoption Act of 1970. Act of July 24, 1970, P. L. 620, §§301, 303, 321, 1 P.S. §§301, 303, 321.

3 Appellant and Leon Van Randolph, Jr., the father of the relinquished child, were married on September 18, 1971.

4 This matter was certified to us by the Superior Court, where jurisdiction to hear the appeal would otherwise lie.

The Adoption Act applicable to the present case provides for the severance of parental rights in one of four ways: voluntary relinquishment prior to adoption, an abandonment decree prior to adoption, a judicial determination of abandonment at the adoption proceeding or adoption by consent of the natural parents at the adoption hearing. Act of April 4, 1925, P. L. 127, §§1.1, 1.2, *as amended*, 1 P.S. §§1.1, 1.2, *repealed*, Act of July 24, 1970, P. L. 620, §601, 1 P.S. §601. In the case of a pre-adoption voluntary relinquishment, as here, the act mandates that if the mother of the illegitimate child is not eighteen years of age or over, the parent or parents of the minor mother must consent to the petition to relinquish parental rights.

It is appellant's position that, although she and her mother appeared to have assented to relinquishment, the necessary "intelligent, voluntary and deliberate" consent prescribed by the Adoption Act was lacking. *Susko Adoption Case*, 363 Pa. 78, 69 A. 2d 132 (1949). This Court in *Susko*, determined that the "intelligent, voluntary and deliberate" consent prescribed by the Adoption Act was lacking because the "[natural mother] signed [the consent to adoption] when she was eighteen years and two months, at a time very soon after her mother's death, and while subjected to reprehensible coercion on the part of her brothers." 363 Pa. at 83, 69 A. 2d at 135.

*Susko* stands for the proposition that an involuntary consent is no consent, and that it is appropriate under circumstances of vitiated consent to withdraw a validly executed formal instrument purporting to surrender parental rights.

Appellant seeks to apply the *Susko* concept to the facts of this case: appellant was fourteen years of age at the time of the relinquishment of her daughter; appellant lived in a foster home during the last half of

her pregnancy because of her inability to co-exist with her mother during that period; and appellant was purportedly unaware of the alternatives to permanent relinquishment. The circumstances surrounding this voluntary relinquishment, however, do not indicate a vitiated consent by either appellant or her mother.

Appellant was counseled by case workers of the Episcopal Children's Service throughout her pregnancy and during the period between her daughter's birth and the date of the voluntary relinquishment. During her last four months of pregnancy, appellant attended a high school accommodating only unwed pregnant young women. She was thus afforded ample opportunity to discuss her situation with empathetic persons. Testimony offered by appellant indicates that she is, and was at the time of the relinquishment decision, an intelligent and capable adolescent. There is no affirmative indication that appellant's relinquishment of her daughter was unintelligent, involuntary or unconsidered.

Despite the congenital deaf-muteness of appellant's mother, her testimony at the April 30, 1969, relinquishment hearing, as translated, evidenced an intent to join in appellant's wish to extinguish parental rights in the infant Stephanie. Appellant's mother's testimony at the June 30, 1971, hearing before Judge BROWN, held in connection with the appellant's petition to vacate the voluntary relinquishment, evidences a change of position with respect to appellant's relinquishment decision, not a vitiated consent *at the time of the decision*: "I thought the baby would be placed with a mother with a good income, with a comfortable home, and not with a poor person from bad surroundings. A person with money, a nice home and a place for the baby. *I went to the hearing because I was expecting the baby to be placed in a good home. . . .*" (Emphasis added.)

584

Despite the pathetic consequences for appellant, there is no provision in the former Adoption Act intended to accommodate the hindsight of the natural parent or her guardian. The prior Adoption Act prescribed that the court rendering a decree of relinquishment direct the transfer of custody of the child to the authorized agency and give authority to the agency to consent to the child's adoption *"without further consent of or notification to the parent or parents."* Without such a proviso, the prospective adopting parents would have "to assume the risk of a change of mind by the natural parents before the adoption could be legally accomplished. . . ." *Hildenbrand Appeal,* 405 Pa. 579, 582, 176 A. 2d 900, 901 (1962). The express language of the former act and this Court's decision in *Hildenbrand* underscore the necessity for finality in the natural parent's decision to extinguish her rights in the once relinquished child.

We hold that appellant and her mother gave "intelligent, voluntary and deliberate" consents to relinquishment. That each has changed position does not permit us to disturb the finality of the initial decision.[5]

Appellant next argues that the hearing on the Petition for Voluntary Relinquishment violated her constitutional rights under the Fourteenth Amendment. It is urged that due process requires more than a "token" hearing and that appellant was denied her "right to counsel" at the relinquishment hearing.

---

[5] The recent United States Supreme Court decision in *Stanley v. Illinois,* 405 U.S. 645 (1972), does not apply to this case. In *Stanley,* an unwed father, whose children were declared wards of the state on the mother's death, attacked the Illinois statutory scheme as violative of equal protection where the children were separated from the unwed father without hearing upon the father's parental fitness. Since the unwed father here did not challenge the voluntary relinquishment procedure, we do not reach that issue.

The appellant's position is novel in that she attacks the propriety of the proceedings which she instituted for the purpose of obtaining the decree which she won, but now seeks to avoid. Though novel, appellant's position is without merit.

Appellant's argument that the relinquishment hearing was lacking in due process is grounded upon the belief that the hearing was "a very short one" in which only "a few routine questions were asked." Appellant proffers no examples of unexplored areas of necessary inquiry. Instead, she posits that "[t]he colloquy [between the court, appellant and her mother] should have been longer and more detailed."

An examination of the record of the April 30, 1969, hearing does not indicate a denial of due process. The court informed appellant of the consequences of her decision, questioned whether she understood the nature of relinquishment and inquired of appellant whether her decision was entered into uncoerced. Appellant's mother was similarly questioned. With her daughter translating, appellant's mother gave an unhesitating affirmative response to the question whether she consented to the permanent relinquishment of her daughter's parental rights. There is no indication that she did not comprehend the significance of her answer.

Appellant asks that we extend the right to representation, afforded to juvenile defendants by *In re Gault*, 387 U.S. 1 (1967), to juveniles who are not criminal defendants, but who stand to forfeit "substantial rights." *Gault* extended the right to counsel to juveniles in "proceeding[s] where the issue is whether the child will be found to be 'delinquent' and subjected to the loss of his liberty. . . ." 387 U.S. at 36. *Gault* is inapposite in this setting. We are not compelled to afford juveniles the right to representation in civil proceedings by the authority of *Gault*.

We therefore find no deprivation of due process in the proceeding which formalized appellant's decision to extinguish her parental rights in the infant Stephanie Watson. However, we remand the matter to the court below to consider the impact, if any, of *Stanley v. Illinois*, 405 U.S. 645 (1972). Each party to pay own costs.

DISSENTING OPINION BY MR. JUSTICE MANDERINO:

I dissent. The issue in this appeal is whether the parental rights of Denise Renee Watson were properly terminated in a voluntary relinquishment proceeding in 1969, involving Denise's daughter Stephanie, who was not quite five months' old at the time of the alleged termination of parental rights.

The mother in this case was fourteen years of age at the time of the alleged termination of parental rights. Thus, the mother's consent, no matter how knowing or intelligent or voluntary was totally ineffective under the Adoption Act of 1925 or the Adoption Act of 1970, cited in the majority opinion. The law wisely prohibits any consideration of the fourteen-year old mother's consent in determining whether a valid termination of parental rights has occurred. This same policy is followed in many other areas of the law. As an example, a fourteen-year old *cannot* agree to purchase an automobile no matter how knowing, intelligent and voluntary the act of consent may be. The pro se consent of a fourteen-year old to a termination of the fourteen-year old's parental rights is impossible under the law. Thus, whatever Denise did or said in the 1969 proceeding had absolutely no legal effect.

The next question is whether *anyone*, properly acting as Denise's legal representative at law, properly consented to the termination of Denise's parental rights

to her daughter, Stephanie. I disagree with the majority that Denise's mother was a proper legal representative or that Denise's mother acted within the customary recognized framework of the obligations of a legal representative.

In many situations, a parent properly acts as the legal representative of a minor child. Where, however, there is a serious question as to a possible conflict of interest between the legal representative and the beneficiary of the legal representation, the actions and conduct of the legal representative should not be given a judicial stamp of approval.

It is undisputed that at the time of the 1969 hearing in which Denise's mother was acting as Denise's legal representative, Denise and her mother had a very strained relationship which predated Denise's pregnancy. That relationship was by no means improved when it became known that Denise was to have a child. In such a context, how can a court conclude that the legal representative, the mother, represented the interest of the child rather than her own personal interest in the legal proceeding? In many legal situations, the interest of a parent as guardian coincides with the interest of the child. This is frequently not true when the issue concerns a child born without a formal marriage contract between the child's mother and father. The grandparents of the newborn child may have a personal interest in the entire situation which raises a reasonable suspicion of a conflict of interest. Such a reasonable suspicion alone should invalidate the alleged consent to the termination of Denise's parental rights by her mother.

This is not to say that the interest of the grandparents of the newborn child, whose parents never formally entered into a marriage contract, are not real and understandable. They may be concerned about the

expense of raising the child, or the embarrassment (real or imagined) which may result or other serious problems. Whatever self-interests the grandparents may have, such interests can easily be in conflict with the interests of the child whose parental rights are being terminated. In this case the issue is not whether Denise's mother wanted the child taken from Denise, in 1969, the issue is whether Denise's mother acted in the best interests of Denise, the mother of the new baby, and even perhaps the best interests of the father of the child, who was sixteen years' old at the time and who has since married Denise.

I do not say that it is conclusive that Denise's mother did not act in Denise's best interests. I simply say that the reasonable possibility of a conflict of interest is sufficient and the law should not recognize such a legal representative as a proper representative. All legal representatives must act in a fiduciary capacity and in all other contexts of our law fiduciaries are judged strictly. We do not allow the slightest suspicion of any conflict of interest between the fiduciary and the beneficiary of the fiduciary's conduct. We certainly should not do so when the question involves giving up a child any more than we would do so if the question involved giving up any other benefits.

The importance of distinguishing clearly between the legitimate interests of the legal representative and the legitimate interests of the beneficiary is seen clearly in this case. The evidence in this case clearly indicates that the paternal grandparents of the baby Stephanie offered to take the baby who was fathered by their son. The evidence also indicates that Denise and the father of baby Stephanie continued an uninterrupted relationship after the birth of their baby and married each other in 1971. Considering these circumstances,

there certainly is at least grave suspicion whether or not Denise's legal representative (her mother), in the 1969 termination of parental rights proceeding, acted in the best interests of Denise.

The law requires the consent of a parent or guardian (legal representative) when the question involves the termination of the parental rights of a fourteen-year old. This does not mean that any consent by the legal representative is a valid consent. The law always implies in the case of a legal representative that their conduct is in the best interests of the beneficiary of their trust.

In addition, we should not approve the actions of a legal representative who acts without obtaining legal assistance. It is rare in our society to find persons acting in their own behalf who venture into any court proceedings without the assistance of legal counsel. Did the fiduciary in this case properly act as a fiduciary venturing into the courtroom in such a serious proceeding without legal counsel? Would any court approve the conduct of a trustee who was not a lawyer, if the trustee acted as his own legal counsel in his trust capacity and made important decisions concerning the beneficiary of his trust? The question answers itself. This Court should not water down the obligations of a fiduciary when the beneficiary of the fiduciary's trust may lose a child any more than we have consistently refused to do so when the beneficiary stands to lose a bank account.

The decree should be reversed.

Mr. Justice NIX joins in this dissenting opinion.