333 A.2d 466
**In re David Evan FRITZ, minor child.**
**Appeal of Joy Fritz COOK.**

Supreme Court of Pennsylvania.

Submitted Nov. 13, 1973.

Decided Jan. 27, 1975.

Rehearing Denied March 20, 1975.

As Modified April 11, 1975.

Ronald C. Travis, Williamsport, for appellant.

Peter R. Andrews, York, for appellee, Tressler Lutheran Home for Children.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION OF THE COURT

MANDERINO, Justice.

On May 19, 1972, a decree was entered by the Lycoming County Court of Common Pleas terminating appellant's parental rights in her son David, then nineteen weeks of age. Adoption Act of 1970, Act of July 24, 1970, P.L. 620, § 303, 1 P.S. § 303. That decree was entered pursuant to a petition for voluntary relinquishment filed on her behalf. When David was born on January 2, 1972, appellant was fourteen years old; she was fifteen years of age when the decree was entered on May 19, 1972. Nine months after the entry of the decree, appellant filed a petition to set the decree aside. Relief was denied and this appeal followed.

The appellant contends that her consent to relinquish her parental rights was a vitiated consent, one which was not voluntary, intelligent and deliberate. *Susko Adoption Case*, 363 Pa. 78, 69 A.2d 132 (1949). The trial court relied on *Watson Appeal*, 450 Pa. 579, 301 A. 2d 861 (1973) in denying relief. *Watson Appeal* was decided on March 16, 1973, seven days after the close of the hearings in this case, and while the matter was under advisement by the trial court. The application of the principles of *Watson* to the facts of this case, however, does not warrant the conclusion that appellant's consent to the relinquishment of her parental rights was voluntary, intelligent and deliberate.

In *Watson*, we held that the circumstances before and after the parent's consent at the relinquishment hearing

"[did] not indicate a vitiated consent . . . ." *Watson* considered the circumstances before the termination decree and concluded that the juvenile appellant had the benefit of advice and counsel from persons whose judgments were made with appellant's best interest in mind:

"Appellant was counseled by case workers of the Episcopal Children's Service throughout her pregnancy and during the period between her daughter's birth and the date of the voluntary relinquishment. During her last four months of pregnancy, appellant attended a high school accommodating only unwed pregnant young women. She was thus afforded ample opportunity to discuss her situation with *empathetic* persons." (Emphasis added.)

*Id.* at 583, 301 A.2d at 864.

The empathetic persons who provided advice and counsel to the juvenile in *Watson* were knowledgeable, having expertise and experience in assisting unwed mothers, and were neutral, having no self-interests to promote.

*Watson* also considered the circumstances after the decree and concluded that for a period almost twenty-one months after the decree the parent did not manifest "any misgiving about the relinquishment decision."

The evidence in *Watson* did not indicate a vitiated consent at the time of appellant's relinquishment decision, but rather "a change of position with respect to [that] relinquishment decision . . . ." Such a change could not provide the basis for setting aside a termination decree because of "the necessity for finality in the natural parent's decision" to relinquish parental rights. *Id.* at 584, 301 A.2d at 864.

The case before us is in stark contrast to *Watson*. In *Watson*, we considered all the circumstances and concluded that the appellant's decision was uncoerced; a review

of all the circumstances in this case compels the opposite conclusion.

Shortly after the baby's birth, the appellant was visited by a social worker for the Tressler Lutheran Home for Children. Although the record is unclear as to who invited the social worker to visit the appellant, the record is clear that the appellant did not do so. Appellant was told that the agency would care for the child until she made up her mind about what to do. Less than one month later, however, she was asked to sign a petition for voluntary relinquishment of her parental rights. The record is silent as to who prepared the petition, but there is no evidence that the appellant requested the preparation of the petition or told anyone that she had made a decision to give up her child. On the contrary, the record indicates that when she signed the relinquishment petition she had not decided to give up her parental rights: she refused to permit the filing of the petition and requested that there be no termination hearing scheduled.

During February, March, April and May of 1972, appellant made at least fifteen visits to discuss the matter with the social worker. There is no evidence that during this time she indicated any intention to give up her son. During this same period, appellant also discussed the matter on numerous occasions with her mother and with her child's father, and at all times indicated that she wanted to keep her son. Appellant also expressed the same intent to her father on various occasions. In spite of this continually expressed desire not to give up her son, appellant was regularly subjected to pressure to do otherwise. Her mother refused to allow the baby to be brought to her home, where appellant also lived, even though she knew that her daughter "wanted her child." Appellant's father, although sympathetic to the appellant's wishes, mostly stayed out of the matter. On numerous occasions, the father of the child, who was a

neighbor, offered to marry the appellant only if she would give up the baby.

Appellant was also subjected to pressure because of accumulating financial charges for the care of her son at the agency's home. When the agency took custody of the child, appellant had to sign a paper stating that she would pay maintenance charges of three dollars a day. These charges worried the appellant as they continued to accumulate. When she told the social worker about this concern, the answer she received was hardly that of an "empathetic person":

"[Appellant's counsel] : Alright, you said the bill was not the most important thing but that is not the same thing as saying you don't have to pay that bill. Is it?

[Social worker] : Right?

[Appellant's counsel] : O.K. so did you ever tell her that she did not have to pay that bill?

[Social worker] : I don't know if I ever said you don't have to pay that bill, but I told her she would never be *forced* to pay that bill.

(Emphasis added.)

Finally, in May of 1972, after about four months of such pressure, appellant agreed to give up her child and appeared in court stating that she consented to the termination of her parental rights. The day immediately following the hearing and termination decree, appellant was taken by her mother to Arizona for a vacation. During the three weeks the appellant was in Arizona, she wrote to the social worker about her son. Appellant testified that she told the social worker in the letter that she still wanted her son. The social worker did not contradict appellant's testimony. She admitted receiving and answering the letter but couldn't recall exactly what it said:

"A. She did send me a letter. I can't recall exactly what she said. I know one question she asked us.

How the baby was doing, and I wrote in response to that. How the baby was doing."

Appellant returned from Arizona in July without her mother, and within a few days went to see the social worker. She also visited the social worker on several other occasions during July. In August, appellant returned to the agency—this time accompanied by the child's father—and told the social worker she wanted her child. The social worker said nothing could be done. During September, October, November, and December, appellant continued to contact the social worker inquiring about her child. In January of 1973, the appellant learned through the father of the child that a petition had been filed for its adoption. The father of the child had received notice of the adoption petition although, because of the voluntary relinquishment hearing that had taken place in May of 1972, appellant did not. Appellant was no longer living with her mother, but was living with foster parents and attending school in Bloomsburg, Pennsylvania, when she learned about the adoption proceeding. The appellant, with her foster parents, went to the adoption hearing and attempted to have the voluntary relinquishment decree set aside. Upon being informed by the court in Cumberland County, where the adoption petition was pending, that any challenge to the voluntary relinquishment would have to take place where that decree was registered, the appellant obtained counsel and filed a petition in Lycoming County, on February 12, 1973, asking that the termination decree be set aside.

■ The circumstances in this case do not permit a conclusion that the appellant's consent was voluntary, intelligent, and deliberate. From the time the appellant first learned of her pregnancy until the day of the termination decree, she continually manifested to all persons with whom she discussed the matter that she wanted to keep her child. Following the termination decree, these manifestations continued. During the entire period be-

tween the child's birth and the appellant's court appearance, she was under pressure from her mother, from the child's father, and from the accumulating charges at the Tressler Home to give up the child. There is no evidence that appellant was aware of alternatives to termination of her parental rights. This case is not one in which a parent had a change of mind because of a change in circumstances after a termination of parental rights. In her foster home, appellant, for the first time, may have found persons empathetic with her, but this change in circumstances did not cause a change of mind. The record is clear that at no time did appellant intend to relinquish her parental rights. In court one day, she consented to the termination of her parental rights, but under all. the circumstances, that consent was invalid.

Because of the irreversible nature of a decree terminating one's parental rights, such action must be shown by a preponderance of the evidence to be clearly warranted. *McAhren Adoption*, 460 Pa. 63, 331 A.2d 419 (1975); *In Re: Adoption of R. I.*, 455 Pa. 29, 312 A. 2d 601 (1973); *Sarver Adoption Case*, 444 Pa. 507, 281 A. 2d 890 (1971). To terminate one's parental rights requires that a "demanding standard" of evidence be satisfied. *Jones Appeal*, 449 Pa. 543, 297 A.2d 117 (1972). Appellant's relinquishment of her baby was not clearly shown to have been done voluntarily, knowingly and with deliberation. The trial court should have granted the petition to vacate the May 19, 1972 decree which terminated appellant's parental rights and should have granted appellant's petition for custody of her child.

Decree reversed and the matter remanded with instructions that the termination decree of May 19, 1972 be vacated.

POMEROY, J., dissents.