## IN THE MATTER OF KENNETH JACKSON, JR

Docket No. 56808. Submitted January 22, 1982, at Detroit.—Decided April 7, 1982.

Kenneth Anderson Jackson, Jr., was born out of wedlock to Pamela Carter, a 16-year-old minor, on July 12, 1979. Prior to the child's birth, both the mother and putative father contacted Lutheran Children's Friend Society, requesting adoption services. Upon discharge from the hospital, the child was immediately placed in foster care with the society. After the parents failed to keep an August, 1979, court appointment at which a voluntary release for adoption was to be signed, a petition for permanent custody, alleging dependency, was filed in the juvenile division of the Wayne Probate Court. A hearing on the petition was held on November 8, 1979. The child's dependency was found but the prayer for permanent custody was denied and the child was made a ward of the court and placed in the foster care of the Department of Social Services. Both the mother and putative father were represented by counsel at that hearing. The statutory rehearing was held on May 9, 1980, at which time foster care was ordered to be continued. No party was represented by counsel at that hearing. At the next scheduled juvenile code rehearing on October 31, 1980, referee Beverly Hall found that the parents had agreed to sign releases

REFERENCES FOR POINTS IN HEADNOTES

[1] 20 Am Jur 2d, Courts §§ 79, 104.

47 Am Jur 2d, Juvenile Courts and Delinquent and Dependent Children § 38.

[1, 3] 59 Am Jur 2d, Parent and Child § 5.

[2, 7] 2 Am Jur 2d, Adoption § 44.

Mistake or want of understanding as ground for revocation of consent to adoption or of agreement releasing infant to adoption placement agency. 74 ALR3d 489.

What constitutes undue influence in obtaining parent's consent to adoption of child. 50 ALR3d 918.

Sufficiency of parent's consent to adoption of child. 24 ALR2d 1127.

[4, 6] 2 Am Jur 2d, Adoption § 58 *et seq.*

16A Am Jur 2d, Constitutional Law § 842.

[5] 2 Am Jur 2d, Adoption §§ 2-7.

[7] 4 Am Jur 2d, Appeal and Error § 134.

and consents for adoption. The matter was then referred to referee Gerald Kaminski for a release for adoption hearing pursuant to the Adoption Code. The consequences of the releases were explained by the referee and the referee determined that Pamela Carter had freely and voluntarily signed the release form. Neither the mother nor putative father of the child were represented by counsel at either of the October 31, 1980 hearings. On November 19, 1980, Pamela Carter's court-appointed attorney filed a petition to set aside the release, alleging that Carter had been under duress when she signed the release and that changed circumstances resulted in Carter's ability to now take care of the child. After hearing testimony, Y. Gladys Barsamian, J., denied the petition for review, finding that Pamela Carter was not under duress at the time she signed the release and that the changed circumstances were insufficient to set aside the release. Pamela Carter appeals. *Held:*

1. The Juvenile Court Rule requiring appointment of counsel to indigent parents at juvenile court proceedings involving the termination of parental rights is not applicable to proceedings under the Adoption Code. Since the Adoption Code proceedings arise out of a voluntary act by the parent rather than being adversarial in nature as are the proceedings under the juvenile code, due process does not require the appointment of counsel for indigent parents executing a release for adoption pursuant to the Adoption Code.

2. Any error resulting from the failure to appoint counsel to represent either the indigent parent or the child at the juvenile code proceedings constitutes harmless error with respect to the subsequent Adoption Code proceedings at which the release for adoption was signed.

3. The probate court did not abuse its discretion in finding that there was no duress and that the changed circumstances were not sufficient to warrant setting aside the release for adoption.

Affirmed.

1. COURTS — PROBATE COURTS — TERMINATION OF PARENTAL RIGHTS — APPOINTMENT OF COUNSEL — JUVENILE COURT RULES.

A probate court sitting as the juvenile division of the court pursuant to the provisions of the juvenile code is required by court rule to appoint on its own motion counsel to represent indigent parents at hearings which may involve termination of their parental rights pursuant to the provisions of the juvenile code (JCR 6.3[A][2][b]).

2. Adoption — Release for Adoption — Adoption Code.

A release for adoption pursuant to the Adoption Code is rendered void only upon a showing that the release was involuntarily executed (MCL 710.29[5]; MSA 27.3178[555.29][5]).

3. Adoption — Termination of Parental Rights — Juvenile Code — Adoption Code.

The distinction between a termination of parental rights under the juvenile code and a termination of parental rights under the Adoption Code is that proceedings under the juvenile code are involuntary, being brought by the state, while the proceedings under the Adoption Code are initiated by the voluntary acts of the parents (MCL 710.21 *et seq.*, 712A.1 *et seq.*; MSA 27.3178[555.21] *et seq.*, 27.3178[598.1] *et seq.*).

4. Constitutional Law — Due Process — Adoption — Adoption Code.

Due process does not require the appointment of counsel for indigent parents for the purpose of a hearing pursuant to the Adoption Code at which a release for adoption is executed.

5. Adoption — Adoption Code — Legislative Purposes.

The legislative policy underlying the Michigan Adoption Code is that of preserving the finality of decisions in releases for adoption (MCL 710.21 *et seq.*; MSA 27.3178[555.21] *et seq.*).

6. Adoption — Juvenile Code — Adoption Code.

Any error resulting from the failure to appoint counsel to represent either an indigent parent or the child at a hearing to terminate parental rights pursuant to the juvenile code constitutes harmless error with respect to proceedings involving a voluntary release for an adoption executed pursuant to the Adoption Code.

7. Adoption — Probate Courts — Appeal.

The standard of review on appeal of an order denying a petition to set aside a voluntary release for adoption is whether the probate court abused its discretion; appellate courts are reluctant to reverse the probate court's order unless there has been a clear abuse of discretion.

*Neil A. McQuarrie,* for Pamela Carter.

*Norman Nigro,* for Lutheran Children's Friend Society.

Before: N. J. KAUFMAN, P.J., and V. J. BRENNAN and R. L. TAHVONEN,* JJ.

V. J. BRENNAN, J. Appellant, Pamela Carter, an unemancipated minor, appeals by right from an order of the Wayne County Probate Court denying her petition to set aside a voluntarily executed release of her parental rights over her minor child. MCL 710.65(1); MSA 27.3178(555.65)(1).

Kenneth Anderson Jackson, Jr., was born out of wedlock to the appellant, a 16-year-old minor, on July 12, 1979. The alleged father, Kenneth Anderson Jackson, later acknowledged that he was the father of the child. Prior to the child's birth, both the appellant and putative father had contacted Lutheran Children's Friend Society (hereinafter LCFS) requesting adoption services. Upon discharge from the hospital, the child was immediately placed in foster care with LCFS.

The appellant and putative father cancelled scheduled visits with the child in July and August of 1979 and failed to keep a court appointment in August, 1979, at which a voluntary release for adoption was to be signed. Subsequently, on August 21, 1979, a petition was filed in the Wayne County Probate Court, Juvenile Division, alleging dependency of the child and asking the court to take permanent custody of him for adoption purposes.

A hearing on the petition was held on November 8, 1979, before referee Clinton Carter. Present at this hearing was appellant and her mother, acting as guardian ad litem for appellant. Appellant was represented by Mr. Kriger of the Juvenile Defender's Office. The putative father, who was not present, was also represented by counsel, Mr. Leonard.

* Circuit judge, sitting on the Court of Appeals by assignment.

Appellant stipulated to the child's dependency but opposed the prayer for permanent custody. At the close of the testimony, the court found the child to be dependent and, therefore, coming within the juvenile code's provisions, MCL 712A.1 *et seq.;* MSA 27.3178(598.1) *et seq.* The court denied the permanent custody prayer and made the child a temporary ward of the court, to be placed in foster care with the Department of Social Services. A statutory rehearing was then set for six months.

The statutory rehearing was held on May 9, 1980, at which time the child, still within the juvenile court's jurisdiction, was ordered continued in foster care. Appellant was accompanied by her mother, acting as guardian ad litem. The putative father was not present, however, two days prior he had signed an affirmation of paternity, denial of interest in custody of the child and a waiver of notice of the hearing. There was no attorney present on behalf of any party at this hearing. When questioned by the referee, appellant testified that she wanted to keep the child. The referee admonished appellant to cooperate with the social workers by following through with any referrals of counseling. The matter was then continued to the next statutory rehearing scheduled for October 31, 1980.

On that day, two separate statutory hearings were conducted. First, appellant and the putative father appeared before referee Beverly Hall, who made a finding that the "[p]arents have agreed to sign releases and consents for adoption". She set a statutory hearing for a report on adoption planning for April 24, 1981. The matter was then brought before referee Gerald Kaminski for a release for adoption hearing. It is critical to note at this point that the probate court was no longer

acting pursuant to the Michigan juvenile code, MCL 712A.1 *et seq.;* MSA 27.3178(598.1) *et seq.,* but was functioning according to its statutory power under the Michigan Adoption Code, MCL 710.21 *et seq.;* MSA 27.3178(555.21) *et seq.* Present at this hearing were the appellant, her mother acting as guardian .ad litem, and the putative father of the child. Again, no attorney was present on behalf of any party at either of these two hearings. Referee Kaminski explained to the parties the consequences of their signing the release as follows:

"*The Court:* Do you understand that this release form that I have before me today, the court looks upon as being the final order, the final decision that you have made. And that the reason that I am saying that so emphatically to you is because one of the things the law does not recognize is that the woman has a right to change her mind, so when you sign the release form today, I have to be certain of a couple of things.

"One, that you understand what you are doing. That you are doing it freely and voluntarily and that you understand that this is a final order and a final decision that you are making. The only way that this matter can come back into court is if within the next 20 days you should decide that you want to have a change of heart. If you petition the court to look back into the matter, the matter would come back to the court. The court does not have to grant your petition for review or it does not have to grant a change as far as this release is concerned. So this is why I am saying to you that this is viewed as a final order of this court, understand?"

The court further explained to the parties that in releasing the child for adoption they were permanently giving up all legal rights to the child. After questioning appellant, the court determined to its satisfaction that appellant had freely and voluntarily signed the release form.

On November 19, 1980, a petition for review was filed on behalf of appellant by court-appointed counsel, requesting the previously executed release be set aside. Appellant alleged that she was under duress at the time she signed the release and that circumstances had changed since that time, resulting in appellant's ability to care for her child with the help of relatives, namely, her mother.

A hearing on this petition was held before Judge Y. Gladys Barsamian on March 4, and March 9, 1981. Appellant testified that she had been "pressured" into signing the release by her parents and the child's father. When asked whether the LCFS workers had pressured her at all, she stated: "No. * * * [T]hey wanted whatever I wanted." She also testified that immediately after her signing the release her parents' attitude had changed in that they were now willing to help her care for the child.

Appellant's mother then testified that she did not encourage her daughter's decision regarding the release either on or prior to October 31, 1980. She also stated that, later on the same day the release was signed, she had changed her mind about bringing the child into her home. Up until that time, she was unwilling to help her daughter care for the child because she had been ill.

Next, the child's father testified that he had encouraged appellant to release the child. He stated that before and immediately after the hearing, appellant indicated that she did not want to release the child for adoption.

Finally, Patricia Key, a social worker for LCFS, testified regarding the various suggestions she recommended to appellant in planning for the child, appellant's frequent changes of mind regarding the adoption of the child, and the fact that appel-

lant had visited the child five times from the date of the child's placement in foster care on July 18, 1979, until the date of the release for adoption on October 31, 1980.

Based on the testimony presented at this hearing, the court denied the petition for review finding that appellant was not under duress at the time she signed the release and that the changed circumstances were insufficient to set aside the release.

A claim of appeal to this Court was timely filed by appellant on March 23, 1981, raising several procedural errors in the entire hearing process leading up to the release of her parental rights.

The first question for our consideration is appellant's right to counsel at the statutory hearings. The first action brought in the instant case was the petition for permanent custody of the child filed by a probation officer in the juvenile division of the probate court. Initially, when such a petition is filed, the court must determine whether the child comes within its statutory jurisdiction under MCL 712A.2(b)(1), (2); MSA 27.3178(598.2)(b)(1), (2) which provides:

"(b) Jurisdiction in proceedings concerning any child under 17 years of age found within the county

"(1) Whose parent or other person legally responsible for the care and maintenance of such child, when able to do so, neglects or refuses to provide proper or necessary support, education as required by law, medical, surgical or other care necessary for his health, morals, or who is deprived of emotional well-being or who is abandoned by his parents, guardian or other custodian, or who is otherwise without proper custody of guardianship; or

"(2) Whose home or environment, by reason of neglect, cruelty, drunkenness, criminality or depravity on the part of a parent, guardian or other custodian, is an

unfit place for such child to live in, or whose mother is unmarried and without adequate provision for care and support."

This is known as the adjudicative phase. There is a second phase to the hearing process called the dispositional phase:

"The dispositional phase determines measures to be taken by the court with respect to the child and adults properly within its jurisdiction if the court has determined at the adjudicative phase that the child comes within the statute. There is no right to jury trial." JCR 1969, 8.1(B).

Once a juvenile court takes temporary custody over the child and places the child in foster care, as was the case here, a review hearing, *i.e.,* statutory rehearing, must be held within six months and periodically thereafter for the purpose of determining whether the parents had re-established a home for the child. MCL 712A.19, 712A.19a; MSA 27.3178(598.19), 27.3178(598.19a); see *In the Matter of Gary Lee LaFlure,* 48 Mich App 377, 381-382; 210 NW2d 482 (1973).

At the initial custody hearing in the juvenile court, appellant was adequately represented by counsel. Appellant claims, however, that she was denied the right to counsel at the subsequent two statutory rehearings before the juvenile court and that this prejudiced her voluntary release for adoption.

Appellant cites JCR 1969, 6.3(A)(2)(b) as authority for her claimed right to counsel. JCR 1969, 6.3(A)(2)(b) provides, in pertinent part:

"[C]ounsel shall be appointed on the court's own motion to represent the parents, guardian, or custodian of the child charged with offense against the child at

hearings which may involve termination of their rights when legal aid or public defender counsel is not available, and they are financially unable to employ counsel to represent themselves."

In the leading case of *Reist v Bay Circuit Judge,* 396 Mich 326, 346; 241 NW2d 55 (1976), the Michigan Supreme Court held:

"[JCR 1969, 6.3(A)(2)(b)] requiring the appointment of counsel to represent indigent parents at hearings which may involve termination of their rights is constitutionally based. Because of the nature of parental rights termination proceedings and of the basic, fundamental nature of the parental relationship in our society, the Due Process Clause requires assignment of counsel at public expense for an indigent for hearings when the state seeks to terminate his parental rights."

In reaching its decision, the Court emphasized the fact that:

"The state is the moving force in neglect and termination proceedings. That this is a confrontation between the state and an individual is 'a circumstance of great importance in determining a standard of fairness'." *Id.,* 345.

The *Reist* Court made no distinction between the various phases of the hearing process leading up to the termination of parental rights, *i.e.,* adjudicative, dispositional, or statutory rehearings. According to *Reist,* the due process right to counsel applies to any hearing "which may involve the termination of [parental] rights". Indeed, *Reist* involved a denial of counsel on an appeal of an involuntary termination of parental rights based on neglect.

Appellant notes that the decision whether or not

to file for termination of parental rights is often made at these statutory rehearings. Statutory rehearings are in fact a necessary step in termination proceedings where a child is within the temporary custody of the court and placed outside the home. In this sense, statutory rehearings fall within the meaning of a "hearing which may involve the termination of [parental] rights". Following the *Reist* rationale the due process requirement of right to counsel, therefore, should attach to such a hearing.

However, while this Court may extend the *Reist* holding to include statutory rehearings, this does not completely resolve the issue presented here. Although the initial proceedings brought against appellant were under the Michigan juvenile code, the probate order appealed from is a denial of a petition to set aside a voluntary release of adoption, which is exclusively governed by the Michigan Adoption Code. Thus, the question remains whether the denial of appellant's right to counsel at the juvenile code proceedings caused her subsequent voluntary release for adoption pursuant to the Adoption Code to be void. For a release for adoption to be rendered void, it is necessary to show that it was involuntarily executed. MCL 710.29(5); MSA 27.3178(555.29)(5) is the provision on point:

"(5) A release by a parent or a guardian of the child shall not be executed until after such investigation as the court deems proper and until after the judge, referee, or other person authorized in subsection (2) has fully explained to the parent or guardian the legal rights of the parent or guardian and the fact that the parent or guardian by virtue of the release voluntarily relinquishes permanently his or her rights to the child."

The release for adoption is a purely statutory proceeding under the Michigan Adoption Code, MCL 710.21 *et seq.;* MSA 27.3178(555.21) *et seq.* The primary distinction between a termination of parental rights under the juvenile code as opposed to termination under the Adoption Code is that the juvenile code proceeding is involuntarily brought by the state, whereas the Adoption Code proceeding is voluntarily initiated by the parent. There is no parallel statutory right to counsel provision under the Michigan Adoption Code, nor have the courts held that due process requires the right to counsel at such proceedings. In view of the voluntary nature of a release for adoption, it appears unlikely that *Reist* is controlling since *Reist* is limited to involuntary termination proceedings.

When presented with a due process challenge to its adoption code because of denial of a parent's right to counsel at a voluntary release for adoption hearing, the Pennsylvania Supreme Court, in *In re Watson,* 450 Pa 579; 301 A2d 861 (1973), rejected appellant's constitutional attack on the basis that appellant voluntarily executed the release. The *Watson* court further stated that the appellant, a 14-year-old unwed mother, had been fully apprised of the nature of the release proceeding by the probate judge and had been extensively questioned regarding her understanding of the significance of her decision to sign the release and that there was no evidence that her decision was involuntary in any way.

As in *Watson, supra,* appellant here was fully advised of the legal consequences of her decision by the referee at the release for adoption hearing. The referee took great care to question the appellant and her guardian ad litem concerning their understanding of the proceeding and stressed to

appellant the fact that her decision would be viewed as a final order of the court. Appellant fails to present any evidence which shows that her decision was not freely and voluntarily made.

Appellant also claims error on the basis that her child was not represented by counsel at the five different hearings. The first three hearings, *i.e.,* the initial dependency hearing, and the two statutory rehearings, are subject to the Michigan juvenile code, MCL 712A.1 *et seq.;* MSA 27.3178(598.1) *et seq.* The last two hearings, *i.e.,* the release for adoption and petition for review, are governed by the Michigan Adoption Code (MCL 710.21 *et seq.;* MSA 27.3178[555.21] *et seq.)* As noted in the analysis of the previous issue, this distinction between the two separate statutory proceedings is critical in order to isolate the real issues before this Court.

The two out-of-state cases cited by appellant, *In the Matter of Child X,* 617 P2d 1078 (Wy, 1980) and *State in Interest of Brown,* 387 So 2d 1366 (La App, 1980), in support of her claim, are clearly distinguishable from this instant case. Both out-of-state cases involved appeals from a juvenile court order involuntarily terminating parental rights to a minor child, and the courts' decisions rested on purely statutory grounds.

The appeal in this case is from the probate court order declining to set aside a voluntary release for adoption which is exclusively governed by the Michigan Adoption Code. Under the Adoption Code, there is no provision for the right to counsel for a child at a hearing on a release for adoption or a hearing on a petition for rehearing the question of the release for adoption. Furthermore, there is no court rule or case law in Michigan which requires the right to counsel for a child at such proceedings.

Appellant primarily relies on JCR 1969, 6.1 and 6.3 in support of her claim as to the denial of her child's right to counsel. However, the Juvenile Court Rules are only relevant to the first three hearings, because they fall within the scope of the juvenile code. As to the last two hearings, the Juvenile Court Rules cited by appellant are irrelevant since the juvenile code is inapplicable to such proceedings.

Assuming, *arguendo,* that appellant can establish that her child's interests were adverse to appellant's at the initial dependency hearing, thereby triggering the necessity of counsel under JCR 1969, 6.3(A)(2), the question becomes what effect, if any, does the denial of counsel to the child have on the Adoption Code proceedings? This raises an issue of first impression. In deciding this issue, we consider the legislative policy underlying Michigan's Adoption Code, that of preserving the finality of decisions in releases for adoption. *DeBoer v Child & Family Services of Michigan, Inc,* 76 Mich App 641, 649; 257 NW2d 200 (1977). In light of this overriding policy, the procedural error, if any, claimed by appellant should be deemed harmless and not sufficient to reverse the probate court's order.

Next, appellant claims that the failure of the court to specify a treatment plan constituted reversible error. This claim is totally without merit. Indeed, appellant appears to be pulling at straws at this point. There is no statute or case law requiring the court to specify any treatment plan. However, this Court has stated that the probate court may, in its discretion, set forth guidelines as a precondition for the parent to regain custody of her child. See *In the Matter of Kathren Adrianson,* 105 Mich App 300; 306 NW2d 487 (1981). In

the instant case, the statement made by the probate judge to appellant did not amount to a treatment plan. It was nothing more than words of warning to appellant. Nevertheless, the probate court committed no error in this regard.

Finally, appellant claims that the probate court abused its discretion in denying a hearing of a petition to set aside the voluntary release for adoption. Under the Michigan Adoption Code, MCL 710.64(1); MSA 27.3178(555.64)(1) provides:

"(1) Upon the filing of a petition in probate court within 20 days after entry of any order under this chapter, and after due notice to all interested parties, the judge *may* grant a reheairng and *may* modify or set aside the order." (Emphasis added.)

In interpreting this code provision, this Court has stated:

"[T]he Legislature did not thereby intend to bestow such a remedy on 'change of heart' natural parents as a matter of right. Indeed, quite to the contrary, * * * it would appear that the authority so conferred to either permit a rehearing or to grant a request that a release be set aside was intended to vest the resolution of such questions in the sound discretion of the probate judge before whom the matter is raised." *DeBoer v Child & Family Services of Michigan, Inc,* 76 Mich App 641, 645-646; 257 NW2d 200 (1977).

Accordingly, the standard of review on appeal of an order denying a petition for rehearing to revoke a release for adoption is whether the probate court abused its discretion. *In the Matter of Michael Brent Hole,* 102 Mich App 286, 291; 301 NW2d 507 (1980), *In the Matter of Baby Girl Fletcher,* 76 Mich App 219, 220; 256 NW2d 444 (1977), *DeBoer v Child & Family Services of Michi-*

*gan, Inc, supra,* 646. Based on the policy of finality in decisions relating to adoption, courts are reluctant to reverse the probate court's order unless there has been a clear abuse of discretion. *DeBoer, supra,* 649.

It is appellant's position that she was pressured into signing the release by her mother and the putative father of the child. Further, appellant claims that the changed circumstances since the release, *i.e.,* her parents' willingness to now help her care for the child, justified revocation of the release.

In denying appellant's petition to set aside the release, the probate court explained its decision as follows:

"In considering the petition for review the court must keep the best interest of the child in mind. That is the guide by which the court must be governed.

"In addressing the first argument of the mother relative to the fact that she feels that she was under duress at the time of the release, the court cannot accept that position after having listened to the testimony presented, for it would appear that duress is argued on two bases: one, that she had no other choice but to release the child for adoption, and therefore she was pressured into releasing, which in fact I think that the testimony was replete with all kinds of options that the mother had which she chose not to exercise.

\* \* \*

"I think it was quite clear from even the mother's testimony—her mother, the maternal grandmother's testimony in this case that she pretty much left it up to her daughter in terms of what her decision would be. I think perhaps she may have tried to influence her initially, but it sounds like to me that ultimately she had resigned herself to the fact that the choice was the daughter's choice, and it did not sound to this court that the mother was particularly pressuring the daughter to giving up the child. The mother herself indicated

that the workers had not pressured her, that they had in fact said to her what she wanted was what they wanted. * * *

"* * * [T]he court was not convinced that the father exercised duress on the mother to the point that he had forced her to sign the release or enter into the release.

"The second argument is that the circumstances have changed since the time of the release, and that resulting in the mother now being in a position to be able to provide for the child through the help of relatives. In reality the mother was always able to provide for this child, but again she wanted to do it under her terms and only under a situation that was acceptable to her, which was frankly in the eyes of the court a rather selfish position to take, because you had a youngster who was sitting in foster care.

*   *   *

"* * * [I]t is interesting to this court that while the parents are now—her parents, the maternal grandparents are apparently now willing to provide a home for the child, it too is conditioned. It's not a complete yes we will take our grandchild and we will provide for our grandchild even though our daughter does not. They are willing to take the child, they will help with raising the child providing the mother goes to school and completes her education. What happens if the mother doesn't complete her education? Does that mean that they then negate the contract and then they then say that they will not provide for the child?

"The court reflects upon the fact that the mother has failed to visit, which goes further to show her failure to accept her responsibility and the fact that she is not sure in her own mind whether or not she wants to provide for this child.

*   *   *

"The court notes in fact that she waited until the nineteenth day before she filed her request for review. It seems to me that if you've had a change of heart that you act immediately when you realize what you have done in order to abort the thing and to change it around. * * * And I think at this point to grant the

review and to set aside the release would not be to the best interest of this child, because the mother has not shown the court that she truly wants to be the mother of this child. I think we would be doing this child a great disservice under the circumstances, and therefore the court will deny the review and will sustain the release."

The probate court thoroughly considered all the testimony presented and clearly set forth the reasons for its decision. Moreover, in making its decision, the probate court was properly guided by what it considered to be in the best interests of the child.

Thus, since we do not find a clear showing of any abuse of discretion, the probate court's order is affirmed.