# Court of Appeals, State of Michigan

# ORDER

In re JBRB, Minor; In re JJLB, Minor

Docket No.    361646; 361652

LC No.    21-004913-AD; 21-004914-AD

Elizabeth L. Gleicher
Presiding Judge

Mark T. Boonstra

Thomas C. Cameron
Judges

       The motion for reconsideration is GRANTED, and this Court's opinion issued February 16, 2023 is hereby VACATED.  A new opinion is attached to this order.  This Court applied the proper standards of review but agrees that the phrases "After paternity was officially established" and "father's paternity was established" should be stricken from the opinion.

/s/ Elizabeth L. Gleicher
Presiding Judge

A true copy entered and certified by Jerome W. Zimmer Jr., Chief Clerk, on

April 20, 2023
Date

Chief Clerk

*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

UNPUBLISHED
April 20, 2023

*In re* JBRB, Minor.

No. 361646
Livingston Circuit Court
Family Division
LC No. 21-004913-AD

*In re* JJLB, Minor.

No. 361652
Livingston Circuit Court
Family Division
LC No. 21-004914-AD

ON RECONSIDERATION

Before: GLEICHER, C.J., and BOONSTRA and CAMERON, JJ.

PER CURIAM.

Respondent-mother placed her three-year-old twins in a prospective adoptive home and petitioned along with the prospective adoptive parents (petitioners) to terminate the rights of the children's biological father. Respondent-father fought the petitions and the parties provided widely divergent evidence of father's level of involvement with his children. The trial court assessed the evidence and weighed the credibility of the witnesses before determining that father had a custodial relationship with the children and had provided substantial and regular support and care for them. Accordingly, the court dismissed the petitions pursuant to MCL 710.39(2) of the Michigan Adoption Code. The trial court was in a superior position to resolve this credibility contest and we will not interfere with its factual findings. We affirm.

## I. BACKGROUND

Mother and father have had an on-again-off-again relationship for several years and share two sets of twins.[1]  Their younger children were born in September 2019.  It is undisputed that father provided no support during mother's pregnancy and initially denied paternity.  He saw the children for the first time on December 20, 2019, when he threatened mother, her mother, a friend, and mother's five children with a handgun.  In the spring of 2020, however, mother and father rekindled their relationship.  The witnesses at the hearings included mother and father, mother's parents, father's mother, and a mutual family friend (LS).  The witnesses provided conflicting accounts of how often father was present in the home mother shared with her father, as well as the level of childcare and monetary assistance father provided.  The witnesses even contradicted themselves.  In any event, some evidence supported that father was involved in the children's lives from spring 2020 through early December 2020, when he was finally incarcerated for the December 2019 assault against mother.  Father was released into a rehabilitation program, but absconded on January 2, 2021.  Father moved back in with mother and lived with her and the children until his arrest for absconding on March 3, 2021.

After father's March 2021 arrest, mother asked LS to adopt the twins, but requested that she not tell father or his mother.  LS desired to adopt the children, but opined it was important to let father know.  Thereafter, mother placed the twins with an unidentified prospective adoptive placement (petitioners).  On May 6, 2021, mother and petitioners filed petitions for direct placement adoption and to identify father as the twins' legal parent.  Mother and petitioners subsequently filed petitions to terminate father's parental rights.  The court conducted several hearings over the following months before finally dismissing the adoption petitions on May 31, 2022.  At these hearings, mother and her parents minimized father's role in caring and providing for the children.  They claimed that father provided no financial support, made only brief appearances at mother's home, and preferred to look at his phone or talk to mother over tending to the children's needs.  They also described the couple's volatile relationship and incidents of domestic violence that sometimes occurred in front of the children.

Father was able to impeach several statements made by mother's witnesses.  He, his mother, and LS also testified that father spent significant blocks of time living with mother and the children.  Father and his witnesses described that father changed diapers, fed and bathed the children, and attended some doctor appointments.  He brought his daughter to work with him one day while working on LS's farm.  Father corroborated his testimony with text messages from mother to LS and his mother, as well as mother's Facebook posts, all describing father as a loving and involved parent.

---

[1] Mother also placed the older set of twins in a prospective adoptive home.  That adoption is not a part of these proceedings.  It is unclear whether father challenged that adoption and how that matter resolved.

Ultimately, the trial court determined that father had a custodial relationship with the twins and had provided them with regular and substantial support when he was able. In reaching this conclusion, the court found that LS was the sole witness with no bias, prejudice, or stake in the proceedings. The court further found mother and her parents incredible as witnesses. Accordingly, the court determined that in order to terminate father's parental rights, the parties would have to proceed under the Juvenile Code, not the Adoption Code as raised in the current proceedings. The court therefore dismissed the adoption petitions.

Petitioners now appeal.

## II. ANALYSIS

We review for clear error a trial court's findings of fact during a proceeding under the Adoption Code, *In re BKD*, 246 Mich App 212, 215; 631 NW2d 353 (2001), and review any underlying legal questions de novo. *In re Lang*, 236 Mich App 129, 136; 600 NW2d 646 (1999). "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *In re BZ*, 264 Mich App 286, 296-297; 690 NW2d 505 (2004). We generally defer to the trial court's special opportunity to judge the credibility of the witnesses. MCR 2.613(C); *Woodington v Shokoohi*, 288 Mich App 352, 358; 792 NW2d 63 (2010).

A court may terminate parents' rights to their minor children under either the Adoption Code or the Juvenile Code. The statutory proceedings under each are "completely separate . . . ." *In re Jones*, 286 Mich App 126, 128; 777 NW2d 728 (2009). "The primary distinction" is that under the Adoption Code, at least one parent voluntarily initiates the proceeding while under the Juvenile Code, the state initiates. *In re Jackson*, 115 Mich App 40, 51; 320 NW2d 285 (1982). In this case, the twins' mother voluntarily initiated the proceedings under the Adoption Code.

When, as here, "a child is born out of wedlock and the release or consent of the biological father cannot be obtained, the child shall not be placed for adoption until the parental rights of the father are terminated" under MCL 710.37 or MCL 710.39. MCL 710.31(1). MCL 710.37(1) explains the procedure for determining paternity for purposes of proceeding toward "permanent[] terminat[ion]" of the father's rights. Under this statutory provision, a father may admit paternity and deny "his interest in custody." MCL 710.37(1)(a). In this case, father admitted paternity, but he expressed interest in taking custody of his children.

If the mother desires to proceed to adoption and challenge the father's request for custody, the court must resort to MCL 710.39. That statute provides, in relevant part:

(1) If the putative father *does not come within the provisions of subsection (2)*, and if the putative father appears at the hearing and requests custody of the child, the court shall inquire into his fitness and his ability to properly care for the child and shall determine whether the best interests of the child will be served by granting custody to him. If the court finds that it would not be in the best interests of the child to grant custody to the putative father, the court shall terminate his rights to the child.

(2) If the putative father *has established a custodial relationship with the child **or** has provided substantial and regular support or care* in accordance with the putative father's ability to provide support or care for the mother during pregnancy or for either mother or child after the child's birth during the 90 days before notice of the hearing was served upon him, the rights of the putative father shall not be terminated except by proceedings in accordance with [MCL 710.51(6)] or [MCL 712A.2].  [*Id*. (emphasis added).]

MCL 710.39 "creates two categories of putative fathers and provides different standards for termination of the rights of each": those who have "no established custodial relationship with the child, and who have provided no support for the mother or child," whose parental rights may be terminated under the Adoption Code; and "those who have established some kind of custodial or support relationship prior to the notice of hearing," whose parental rights may only be terminated under the Juvenile Code.  *In re Barlow*, 404 Mich 216, 229; 273 NW2d 35 (1978).  The trial court in this case determined that father came "within the provisions of subsection (2)."  A father falling within MCL 710.39(2) has been described as "a 'do something' father" by Michigan courts.

To qualify as a "do something" father, a putative father must demonstrate that he has either (1) established a custodial relationship with the child *or* (2) provided "substantial and regular support or care in accordance with [his] ability to provide support or care for the mother during her pregnancy or for either mother or child after the child's birth during the 90 days before notice of the hearing was served upon him[.]"  [*In re MGR*, 504 Mich 852, 854; 928 NW2d 184 (2019), quoting MCL 710.39(2) (emphasis added).]

If a putative father has an established custodial *or* supportive relationship with the child, his parental rights may only be terminated after the same showing of unfitness that is required to terminate the rights of any other parent under the Juvenile Code.  *BKD*, 246 Mich App at 222.

The trial court did not clearly err in finding that father had established a custodial relationship with the twins.  The court accepted testimony that father had lived in the same home as mother and the children for long periods between the summer of 2020 and March 3, 2021.  The court credited testimony that father played with the children, as well as fed, bathed, diapered, and dressed them.  He attended some doctor appointments for the twins and watched the older children so mother could take the twins to other appointments.  Father had even taken one of the twins to work with him on one occasion.  Corroborating the testimony in this regard, the court reviewed photographs of father with the children and mother's texts and social media posts.  Although father had been absent at times, the court did not err in finding that overall, father had a custodial relationship with the children.

We acknowledge that mother and her witnesses painted a very different picture of father's role in the children's lives.  However, the trial court was able to observe the witness testimony first-hand and make a reasoned judgment on the credibility of the witnesses.  It is not the role of an appellate court to second-guess such assessments.  See MCR 2.613(C).

Petitioners contend that the custodial relationship was destroyed because father did not stay in contact with the twins after his March 3, 2021 arrest and incarceration. However, if a putative father has "established some kind of custodial or support relationship *prior to the notice of hearing*," he is "subject to termination only by proceedings under the general jurisdictional provisions of" the Juvenile Code. *Barlow*, 404 Mich at 229. Father's custodial relationship with the twins was created prior to notice of the adoption hearings and ended less than 90 days before that notice upon father's incarceration. This standard is very different from the creation of an established custodial environment in child custody cases and we may not graft the child custody standards onto this Adoption Code matter. Further, the evidence does not support that father abandoned his children after his incarceration. Indeed, he requested parenting time which could have been conducted during visitation times at the jail. However, there is no record indication that any court considered and resolved father's request.

Petitioners also challenge the weight given to LS's testimony by the court. They contend that LS was biased in favor of father and was not as neutral as the court believed. However, the record holds significant evidence that LS supported mother long before she met father. LS provided financial support and gifts to mother and the children. She took the children for overnight visits and provided free babysitting services. LS hired father to work on her farm only upon mother's request. When mother asked LS to adopt the twins, she did not refuse. Instead, LS realized that father needed to be a part of the adoption process and notified him. This was not evidence of bias, but of sound judgment.

And contrary to petitioners' claim, the court did not exclude evidence of domestic violence perpetrated by father against mother in the presence of the children. The court ruled that the domestic-violence evidence was relevant "as long as you can relate it to how it impacts his ability to establish [a] custodial environment[]." The trial court did not prevent mother from presenting testimony regarding father's violence against her or err by focusing on whether that violence affected the children's relationship with father.

As the court determined that father had "established a custodial relationship with" the twins, it was not required to also determine that he had "provided substantial and regular support or care." MCL 710.39(2) uses the disjunctive "or" between these two conditions, indicating that only one must be met. See *People v Kowalski*, 489 Mich 488, 499 n 11; 803 NW2d 200 (2011) (cleaned up) (" 'Or' is a disjunctive term, used to indicate a disunion, a separation, an alternative."). Accordingly, we need not consider petitioners' challenges in this regard.

Ultimately, the question in this case is not father's quality as a person or whether he could have done more as a father. The question is whether father had a sufficient relationship such that his parental rights were entitled to the same constitutional protection as any other parent. Evidence of record supports the trial court's finding that he did.

MCL 710.39(3) provides:

> If the court determines that the parental rights of the putative father will not be terminated under subsection (1), the court shall do all of the following:
>
> > (a) Terminate the temporary placement made under [MCL 710.23d].

(b) Return custody of the child to the mother or the guardian unless the mother's parental rights have been terminated under this chapter or other law and are not restored under [MCL 710.62].

(c) Deny the order of adoption and dismiss the pending adoption proceeding.

The trial court followed its duties in this regard. The court also advised the parties that they could seek termination of father's parental rights under the Juvenile Code. The Juvenile Code is much broader than the Adoption Code. Mother and petitioners will have much more leeway to establish that father is an unfit parent whose parental rights should be terminated if they take this legal pathway.

We affirm.

/s/ Elizabeth L. Gleicher
/s/ Mark T. Boonstra
/s/ Thomas C. Cameron