Susko Adoption Case.

Argued September 27, 1949. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

*J. G. McGill*, with him *McGill & McGill*, for appellants.

*Zeno Fritz*, with him *John R. Boland, Jr.*, for appellee.

OPINION BY MR. CHIEF JUSTICE MAXEY, November 14, 1949:

This is an appeal from the decree of the Orphans' Court refusing to permit the adoption of a minor. The question presented is whether the testimony supports the finding that respondent's written consent to the adoption of her infant son is not legally binding and effective?

Petitioners, husband and wife, filed on May 3, 1948, a petition in the Orphans' Court of Venango County praying for the adoption of Timothy Susko, an infant. Attached to their petition was the following "Consent to Adoption" executed by respondent:

"Now March 27, 1948, I, Olga Susko, mother of Timothy Susko, born at Youngstown, Ohio, on June 8, 1947, an illegitimate child whose father has never acknowledged the child, hereby irrevocably consent to the adoption of the said child by Dallas W. Milner and Mary E. Milner, his wife, of R. D. 2, Cranberry Township, Oil City, Venango County, Pa., who have had the said child in their care and custody since February 21, 1948.

"I am white, 21 years of age and reside at 115 Owsley Street, Masury, Ohio." (Signed and acknowledged before a notary public.)

Respondent on August 31, 1948, filed an Answer to the Petition and simultaneously filed a Writ of Habeas Corpus in the Common Pleas Court of Venango County for the return of her child. She averred that the father of the child was a married man residing in Ohio, who was therein identified; that respondent at the time she signed the "Consent to Adoption" was under twenty-one

years of age; and that when she signed that instrument she was mentally confused as the result of her mother's recent death, and was "induced by the duress and undue influence exerted by her seven brothers to deliver the custody" of her child to Mr. and Mrs. Milner.

The child, Timothy Susko, was born to respondent out of wedlock. When Olga became pregnant with Timothy, she was seventeen years old, in high school, and residing with her mother and seven brothers at Masury, Ohio. On disclosing her condition to her mother, the latter on the same day suffered a stroke of paralysis and was hospitalized for a month. Olga's brothers on becoming aware of her condition were incensed and openly resented her presence. They called her vile and opprobrious names, and went so far as suggesting that an abortion be performed. Upon their persistence in February, 1947, Olga went to the Florence Crittendon Home at Youngstown, Ohio, where the child was born on July 8, 1947.

After the child's birth respondent's brothers insisted that she give up the child before leaving the hospital. However, respondent refused, and upon leaving arranged with friends for the temporary care of the child. The child remained there for three months during which time respondent visited it daily and paid for its maintenance. Respondent's mother then suggested that the child be brought home. Upon the arrival of the child the resentment was so strong that one brother left home. Two months later respondent took the child to an aunt's home in a distant city in the hope of relieving the tension. Several times thereafter the child was shifted from respondent's home to the aunt's and from the aunt's home to respondent's. In January 1948, Olga's mother died, and several members of the family accused her of being the cause of their mother's death. As a result of the constant discussion regarding the disposition of the child, respondent finally agreed to give up the child.

Petitioner was informed of the child, Timothy, through his mother, a neighbor of respondent in Masury. On February 22, 1948, petitioner and his wife went to Masury at which time respondent turned the child over to their custody. On several occasions thereafter respondent visited the child when petitioners brought the child to Masury, but on such occasions made no visible protests against petitioners' custody. On March 27, 1948, petitioners secured respondent's signature to the written "Consent to Adoption" above set forth.

After visiting with the child in May, 1948, respondent became determined that she wanted her baby. After consulting with an attorney, respondent went in person to Oil City to the home of petitioners and asked "if they would give up the baby." Petitioners refused, and shortly thereafter instituted this petition for adoption.

At the hearing in reply to the direct inquiry why she had consented initially to the adoption, respondent testified: "Well, after the confusion, after my mother had died, I just didn't know what to do. Everything was against me. My brothers were abusing me. It was the only thing I could do was to sign this paper." The trial judge in his opinion states that he was convinced that the respondent's consent to adoption was "signed under insurmountable duress and coercion. Respondent was baffled by a distressing situation that gave no hope of solution except that dictated by some of her brothers, —viz., consent to the adoption of Timothy." The record fully supports his conclusion.

The scope of review exercised by this Court in the instant case is that exercisable on certiorari; and, consequently, we are required to review the testimony in an attempt to ascertain whether there was evidence sufficient to support the findings: *Weinbach's Appeal,* 316 Pa. 333, 175 A. 500.

Unlike custody cases, in adoption proceedings the welfare of the child is not material until either consent

or abandonment as prescribed by the Adoption Act has been established. "Under the Adoption Act the welfare of the child is weighed only after the necessary consents have already been given or forfeited. The welfare of the child, as an element in adoption proceedings, has no relation to the question of the parent's abandonment": *Schwab Adoption Case*, 355 Pa. 534, 50 A. 2d 504. To the same effect see: *Petition of Sulewski et al.*, 113 Pa. Superior Ct. 301, 173 A. 747.

The lower court concluded that neither a valid consent to adoption had been given by the distressed mother, nor had respondent's actions in giving the custody of her child to petitioners for a period of three months constituted abandonment as contemplated by the statute. Considering first abandonment, the Adoption Act, as amended June 30, 1947, P. L. 1180, §1 (1 PS 1) provides that where abandonment is alleged, a statement must be attached to the petition for adoption that such abandonment has continued for a period of at least six months. This amendment envisages a case where the abandoning parent repents, perhaps, a hasty single act or a short period of neglect in providing for a child, and prescribes that the abandonment be continual for a minimum period of six months. Abandonment "imports any conduct on the part of the parent which evidences a settled purpose to forego all parental duties and relinquishes all parental claim to the child: Weinbach's Appeal, 316 Pa. 333, 175 A. 500": *Schwab Adoption Case*, supra. Irrespective of the fact that the six months statutory period of abandonment was not persisted in by respondent, her conduct negates proof of that "settled purpose to forego all parental duties." The affection respondent manifested for her child, the pressure under which she consented to give up the custody of the infant, together with the fact that within three months she sought its return, clearly contravert proof of an intent to abandon.

The circumstances surrounding the execution of the formal instrument referred herein as "Consent to Adoption" warranted the trial judge in concluding that this young mother's action in signing the Consent to Adoption was not such consent as is required by the Adoption Act. Respondent signed this instrument when she was eighteen years and two months, at a time very soon after her mother's death, and while subjected to reprehensible coercion on the part of her brothers. The consent prescribed by the Adoption Act is a parental consent that is intelligent, voluntary and deliberate. Section 3 of the Act gives the trial judge discretion to require the presence of the natural parent or parents *at the hearing* on the petition for adoption where a formal consent has been executed. This implies that it is not too late even then to withdraw a previously given consent for adoption. If there is no voluntary consent at that time, the requirements of the Adoption Act have not been met. In the instant case the trial judge properly exercised the discretion granted him by the Act.

The decree of the court below is affirmed.