## Hildenbrand Appeal.

Argued November 27, 1961. Before BELL, C. J., JONES, COHEN, EAGEN and ALPERN, JJ.

*Henry A. Meinzer,* with him *Duryea, Larzelere & Meinzer,* for appellant.

*Robert M. Landis,* with him *J. Stokes Adams, III,* and *Adams & Childs,* and *Barnes, Dechert, Price, Myers & Rhoads,* for Children's Aid Society of Pennsylvania, appellee.

*William B. Ball, Milton P. King,* and *Sterling, Magaziner, Stern & Levy,* and *David B. Fitzgerald,* Assistant Attorney General, and *David Stahl,* Attorney General, for Department of Public Welfare, and other nonprofit child caring agencies, as amici curiae.

OPINION BY MR. CHIEF JUSTICE BELL, January 2, 1962:

Helen M. Hildenbrand, an unwed mother, gave birth prematurely to a baby boy on September 9, 1959. She could not bring the baby to her mother's home and had neither a place of her own nor the financial resources to care for him. She got in touch with the Children's Aid Society of Pennsylvania and made arrangements to formally surrender the child. All of the facts and factors regarding relinquishment of the child were explained to her by a representative of the Society. On September 11, 1959, she signed a *temporary* agreement giving custody of the child to the Society and the child was taken by the Society from the hospital on September 14, 1959. On October 29, 1959, she signed a petition relinquishing forever her parental rights to her child and after a hearing thereon was held in the Municipal (now County) Court of Philadelphia, that Court awarded the child to the Children's Aid Society of Pennsylvania in accordance with the Act of 1953, infra. Thereafter, in March, 1960, Miss Hildenbrand requested the Society to return the child to her, but the Society refused. On May 18, 1960, she filed a pe-

tion in the Municipal Court to set aside the aforesaid decree which it had entered sur her petition for voluntary relinquishment of her child and after hearings on this petition, the petition was dismissed by the Court. This appeal followed.

The Act of April 4, 1925, P. L. 127, as added by the Act of August 26, 1953, P. L. 1411, §2, 1 PS §1.1, provides: "When any person under the age of eighteen years has been in the care of an approved agency or institution for a minimum period of thirty (30) days, the parent or parents of such person may petition the court, in the county in which is located that office of the approved agency or institution having the custody of such person, *for permission to relinquish forever all parental rights to such person.*. . .

"The court shall thereupon fix a time for hearing, which shall be not less than ten days after such petition is presented. The hearing shall be private. At such hearing the court, by examination under oath of the parties to the petition, shall ascertain the truth of the facts set forth in the petition and its execution, and if satisfied as to the truth thereof *and that the petition should be granted,* it shall issue its decree so finding, and (1) *directing the transfer of the custody of the person to the approved agency* or institution, *and (2) authorizing such agency or institution to give consent to the adoption* of such person without further consent of or notification to the parent or parents."

Prior to the enactment of this amendment, and even now, unless the voluntary relinquishment procedure is followed, consent by the natural parents to adoption may be withdrawn at any time before the entry of the final decree of adoption: *Harvey Adoption Case,* 375 Pa. 1, 7, 99 A. 2d 276; *Susko Adoption Case,* 363 Pa. 78, 69 A. 2d 132. Thus, the prospective adopting par-

---

* Italics throughout, ours.

ents had to assume the risk of a change of mind by the natural parents before the adoption could be legally accomplished, with resulting heartbreaks to several persons and possible harm to the child.

Following a two year study by the Governor's Committee on Child Welfare of the serious social problems arising under the Act of April 4, 1925, supra, as amended, the Assembly enacted the 1953 amendment. In summarizing the recommendations of the Governor's Committee the Court below aptly said: "The Committee saw the then requirement that a child be in an adoption home six months, with the parents signing consents following placement, as a prolonging of the natural parents' indecision and turmoil, and also as a period of uncertainty [and often heartbreak] for the adoption parents. It also envisioned that the knowledge by the natural parents of the identity of the adoptive parents could present problems in later years. To remove that uncertainty in the placement phase of the adoption machinery and to assure anonymity between natural and adoptive parents, the Committee recommended, after a two-year study, that there be a preliminary judicial hearing, prior to placement, for use of those parents desiring to relinquish parental rights and responsibilities."

Although fairness to adopting parents and the recommendations of many welfare agencies throughout the State probably and naturally influenced the Legislature, the basic reason for the Act was, as it should be, the best interest and welfare of the child.

All the statutory requirements above set forth were complied with, and under all the facts and circumstances here present we cannot say that the lower Court abused its discretion.

Order affirmed.

DISSENTING OPINION BY MR. JUSTICE EAGEN:

The problem this case presents disturbs me greatly and compels the following dissent.

I appreciate the vital need for finality in adoption cases. I am heartily in accord with the recommendations of the Governor's Committee on Child Welfare, referred to in the Majority opinion and the purposes of the resulting 1953 statute. I agree further that all of the statutory requirements were complied with in the instant case. However, much more needs to be considered.

The unwed mother of the child involved became pregnant when she was forty years of age. She lived alone with an aged mother. Upon learning of her condition, appellant, understandingly, became distraught, gave up her employment, and attempted to go to another city to conceal the fact of her pregnancy. When her family gained the news, their reaction was one of hysterical impending disgrace followed by abuse directed toward the appellant. For two months, she was kept a virtual prisoner to hide the situation from the neighbors. Then she was shunted off to a home for aged women and instructed to stay out of sight and in her room. Members of her immediate family during this time vigorously insisted that the expected child be surrendered for adoption, and that the child could not be housed in the family abode. The appellant was financially destitute and the father of the child refused to arrange satisfactory assistance.

The child was born prematurely on September 9, 1959. Just two days later, on September 11, the mother executed a temporary agreement with the agency involved surrendering her rights in the child. The agency took custody of the child on September 14. On October 29, the mother signed the petition for voluntary relinquishment, but only after she had pleaded for an opportunity to see the child and was told that such would be

arranged only if she went through with her agreement to relinquish.

There isn't any doubt in my mind that all during this pertinent period, the appellant was so distraught and confused of mind that her written act of relinquishment was anything but free, voluntary and deliberate. This conviction is strongly sustained by the testimony of a physician, who treated her during the period of pregnancy.

I do not think it need be argued that a document of such great import, as the written voluntary relinquishment of a child by his mother, should clearly be an "intelligent, voluntary and deliberate" act. The law has consistently required that the act of consent to adoption by the natural parents of a child must be of this high character. If the consent is not such, a requested decree of adoption must be refused. See, *Susko Adoption Case*, 363 Pa. 78, 69 A. 2d 132 (1949). Certainly, a voluntary relinquishment is of equal significance and demands similar considerations and standards.

In *Commonwealth ex rel. Berg v. The Catholic Bureau*, 167 Pa. Superior Ct. 514, 518, 76 A. 2d 427 (1950), the Court declared invalid an "irrevocable consent to adoption" given by a mother and pointedly stated: "Relatrix testified that she was emotionally disturbed by her predicament and that she signed the agreement placing her child with respondent from necessity. She was distracted and could recognize no alternative. She had no suitable home for herself and the child at the time and was unable then to provide one. On a change of circumstances she moved with reasonable promptness—about three months after the birth of the child—to regain its custody."

In the instant case, after appellant regained her employment, and satisfactory support and a home for the child was secured, she contacted the agency in order to

have her child returned. This was early in March, 1960, only four months subsequent to the date of the child's placement for adoption. Her pleas were ignored, and no effort was made to reconsider or reevaluate the situation. No one questions that, as of that time and since, she is adequately able to provide a proper home. Needless to point out, that with this would go the priceless, tender care of the woman who brought the child into the world, a very important factor in determining the child's welfare and future best interests.

For these reasons, I feel that the lower court failed to exercise a wise discretion.

I would reverse.