MURDOCK, Judge.
In November 1998, W.M.F. (“the stepfather”) filed a petition to adopt his stepdaughter, A.B.B. Although the child’s father, K.L.B. (“the father”), contested the petition, the Monroe County Probate Court approved the adoption. This court reversed that decision. See K.L.B. v. W.M.F., 757 So.2d 476 (Ala.Civ.App.2000) (“K.L.B. I”) (holding that the probate court and the district court had not complied with the Alabama Adoption Code). After the remand from this court and upon motion by the stepfather, the probate court transferred the case to the juvenile court, pursuant to § 12-12-35, Ala.Code 1975. The juvenile court entered a judgment finding that the father had impliedly consented to the adoption and holding that the stepfather could adopt the child.
The father appeals, arguing, among other things, that the juvenile court erred in finding that the father had impliedly consented to the adoption and in not finding that the father had withdrawn any such consent. Based on our review of the record, we agree.

Lack of Consent

This case, unlike so many that come before the courts of this state, does not involve a father who has shown little or no interest in his child.[1] Compare S.W.B. v. R.C., 668 So.2d 835 (Ala.Civ.App.1995). The child is now 14 years of age and, except for a period of nine months in 1998, there is no question that the father has attempted to be extensively involved in his daughter’s life. In addition, since the adoption petition was filed in 1998, the father has desperately fought to keep his daughter. In August 1997, however, an issue was made of the father’s use of a belt to discipline his child, at which point everything began to change for the father.
The child was born in 1987. The child’s mother and the father were divorced the following year, and the mother was awarded custody of the child. Both parents thereafter remarried and each has a child with his or her second spouse. The father also has two stepchildren. For nine years, the father had “continuous and regular visitation and contact” with his daughter, including every other weekend, holidays, birthdays, and extended periods in the summers. The relationship between the father and the child was good, although hindered by continuing postdivorce strife between the father and the mother. In 1993, for example, the father successfully sought relief from the trial court for the mother’s not allowing the child to use the father’s last name at school.[2]
*338 During a scheduled visit in August 1997, the father used a belt to discipline the child. The punishment caused some bruising. The father testified that he gave the child “four licks on the rear end”; that he was not aware at the time that he was causing any bruising; and that after he had inflicted the punishment, he, the daughter, and three of her friends proceeded to enjoy an outing that day, swimming at a creek. When the child returned to the mother’s home, according to the father, the mother telephoned and told the father that she (the mother) hated him. About this same time, according to the father’s testimony, the stepfather told the father in a telephone conversation that “if he had been there [when the punishment was inflicted], he’d [have] killed [the father].” The mother and the stepfather hired an attorney, who wrote the father a letter telling him that “visitation under the scheduled order as it exists at the present time cannot continue.”
In the wake of these events, the child did not visit the father from August 1997 to December 1998. During this time, the father did not seek judicial enforcement of his visitation privileges, and did not send the child a Christmas present in 1997. The father did continue to make his child-support payments from August 1997 through February 1998, but for a period of nine months beginning in March 1998, the father did not comply with the divorce judgment’s provisions regarding child-support payments and payment of medical expenses. The father continued attempting to telephone the child from August 1997 through January 1998 (on average, about once a month), but the child either would not speak to him or was not allowed to speak to him. The mother testified that the child was simply unwilling to talk with the father and that she could not make the child do so. The father testified that the mother was responsible for disrupting communication between him and the child.
With respect to the cessation of visitation, the father testified as follows:
“A.... Every time I’d get her on the phone, her mama was there, she’d get all upset, emotional, and her mother would say, T hate you, I hate you,’ and then she’d put [the child] on there to tell me that she hated me, she hated me, and' — •
“Q. Could you hear that the child was crying?
“A. Yes. Yes. The whole time.
“Q. During that time period, you got a letter from [the mother and stepfather’s attorney], didn’t you ... ?
“A. Yes.
[[Image here]]
“Q.... That [letter] said ‘Please be further advised that visitation under the scheduled order as it exists at the present time cannot continue’?
“A. Yes, that’s the way I understood it.
“Q. You talked to her — you called her about seeing the child that fall, didn’t you?
“A. Yes.
“Q. What did she tell you?
“A. She don’t want to see you, she don’t want to see you, and it was just— all she was doing was mentally abusing the child.... I kept seeing that and how much it was upsetting her and everything ....
[[Image here]]
“Q. Did you go and get counseling and advice from a lawyer?
“A. No, I thought maybe she would grow up a little bit and wouldn’t have to put her through all this.
“Q. You continued to call your child?
“A. Yes, until the mental abuse just got — I couldn’t stand to see her bawling *339 and crying and being pulled between her and her mom — her mom and I like she was.”
The father testified that during 1998 he would park his car near, or drive by, the child’s school and the child’s home in the hope of at least seeing her from a distance.
From the divorce in 1988 until the trial, with the exception of nine months in 1998, the father consistently paid his child support. The father testified that he and the mother disagreed concerning the mother’s unwillingness to permit visitation during the nine-month period in 1998 and her failure to take the child to preferred-care doctors, and that it was for those reasons that he withheld child-support payments from March through November 1998. The father also presented evidence indicating that the child remained covered during this time under a family cancer policy and life-insurance policy and was a contingent beneficiary of the father’s retirement plan, among other things.
Alabama’s Adoption Code requires that implied consent must be found on “clear and convincing evidence.” Ala. Code 1975, § 26-10A-25(b)(2).[3] Based on our review of the record, we do not believe that the father’s conduct in the months following his August 1997 disciplining of his daughter is clear and convincing evidence indicating the father’s consent to the adoption of his daughter by another man. This is particularly true when the father’s conduct is viewed against the backdrop of his relationship with his daughter before August 1997 and his clearly manifested desire to be an integral part of her life.
Nor does the father’s conduct since November 1998 support the trial court’s judgment. In December 1998, the father paid all child-support arrearages that had accumulated during the preceding nine months. Since then, he has resumed his previous practice of timely making child-support payments every month. The mother received and accepted these payments. Following the filing of the petition for adoption by the stepfather, the father filed a petition in the circuit court to address matters concerning health-insurance payments and enforcement of his visitation rights. Since November 1998, the father has fought as zealously as any normal, loving father could be expected to fight to preserve his relationship with his child, evidently dismayed that his conduct, while admittedly not exemplary, is being construed as a consent to forever end his relationship with his daughter.[4]
*340 In order to reach its conclusion that there had been an implied consent to the adoption in this case, the trial court relied upon its finding that the father did not maintain a “significant parental relationship with the [child] for a period of six months.” The court then drew a legal conclusion that, as a result of the lack of a significant parental relationship for six months, “a legal presumption of the father’s implied consent to the instant adoption petition thereby arose under the provisions of § 26-10A-9, Code of Alabama, 1975.” (Emphasis added.) The trial court explained that its understanding that such a “presumption” arose under § 26-10A-9 was derived from the Comment to that Code section. In its judgment, the trial court stated that “[t]he Official Comment to [§ 26-10A-9] explains that the absence of such relationship for a six-month period gives rise to a rebuttable presumption that the parent has abandoned the child, and casts upon the parent the burden of effectively rebutting the presumption of abandonment and implied consent to the adoption.”
The trial court erred in deriving such a presumption from the language of the Comment to § 26-10A-9. No such rebut-table presumption is found in Alabama’s Adoption Code.
Section 26-10A-9(3) provides that a consent to adoption may be implied by “not ... maintaining a significant parental relationship with the adoptee for a period of six months.” In explaining the selection of six months as the time period, the Comment to § 26-10A-9 states merely that “[t]he six-month time period specified in subdivision [ (3)[5]] is consistent with Ala. Code 1975, § 26-18-7(c), which provides a rebuttable presumption that parents are unwilling or unable to act as parents after a six (6) month period of abandonment.” (Emphasis added.) Thus, the only rebut-table presumption referenced in the Comment to § 26-10A-9 is the one found in Alabama’s Child Protection Act, AIa.Code 1975, § 26-18-1 et seq., which relates only to termination of parental rights under that Act.[6] No such presumption is found in either the Comment to § 26-10A-9 or in the text of § 26-10A-9.
Instead, § 26-10A-9 provides only that a “consent or relinquishment ... may be implied ” where a parent has not maintained a significant parental relationship with the child for a period of six months. Such a finding is not required. The failure *341 to maintain such a relationship does not necessarily equate to an implied consent. As the Comment to § 26-10A-9 does explain, “[j]ust as acceptance of the terms of a commercial contract can be implied from the conduct of a party, so may the consent of a person to the adoption be implied from the conduct of that individual.” (Emphasis added.) The various types of conduct listed in § 26-10A-9 are merely factors a court can consider in making the decision before it, namély, whether the parent has, through his or her conduct, communicated an implied consent to the adoption of his or her child. The fact that one of the factors enumerated in § 26-10A-9 might exist does not equate to a finding of implied consent, nor even give rise to a presumption thereof. As Justice Lyons has noted, “[t]he statute recites those acts on the part of a ‘parent’ from which consent to an adoption ... might be implied.” Ex parte C.V., 810 So.2d 700, 709 (Ala.2001) (Lyons, J., concurring specially) (emphasis added).
Prior to 1990, there was no statutory provision for a parent to give an “implied consent” to the adoption of his or her child. The pre-1990 version of Alabama’s Adoption Code was adopted, in the main, in 1940; instead of providing for an implied consent, the provision in the 1940 Code simply provided that “the consent of a parent who has abandoned the child, or who cannot be found ... may be dispensed with.” Title 27, § 3, Ala.Code 1940. In the context of such a statutory mechanism for dealing with abandoning parents, the holdings of this court in Butler v. Giles, 47 AlaApp. 543, 258 So.2d 739 (Ala.Civ.App.1972), and of the Alabama Supreme Court in Schwaiger v. Headrick, 281 Ala. 392, 394, 203 So.2d 114, 115 (1967), are noteworthy.
In Butler, shortly after a divorce was granted, the father moved to Oklahoma, where he remained for a year or more, except for an occasional visit to his parents in Tallapoosa County. Consequently, the stepfather eventually filed an adoption petition, alleging that the father had abandoned the. child and that he could not be found. Service of notice of the adoption petition was made on the child’s paternal grandfather on May 23, 1970. On May 26, 1970, the child’s father filed his denial of consent to the adoption. As in the present case, the evidence was in dispute as to whether the mother and stepfather had thwarted the father’s effort to visit the child, or .whether the father had not tried to do so. Approximately one year after the divorce was granted, but approximately one year before the adoption petition was filed, the natural father filed a petition in Tallapoosa Circuit Court alleging that he had not been able to exercise rights of visitation and that he had been threatened with arrest by the mother. He also admitted in his petition that he was in arrears in his child-support payments in the sum of $1,300.
On the basis of the facts before it, this court concluded in Butler that the acts or omissions of the father did not evince a “settled purpose to [forgo] all parental duties and relinquish all parental claims to the child.” Quoting from the Alabama Supreme Court’s opinion in Schwaiger v. Headrick, 281 Ala. 392, 394, 203 So.2d 114, 116 (1967), this court concluded:
“ ‘The .father’s failure to comply with the order for support of the child, under the circumstances here presented, and his failure to visit the child under existing misunderstandings in the family, does not, in our judgment, constitute abandonment within the purview of Section 3, Title 27, Code of 1940.’ ”
Butler, 47 Ala.App. at 547, 258 So.2d at 742.
*342 In Schwaiger, the Supreme Court concluded that the appellant had not intended to relinquish his rights, stating as follows:
“The most that can be said is that the natural father quit trying to visit the child; and, also, that after making two monthly payments for the support of the child, ... he quit paying. [The natural father] claims that he sent a payment to his [mother], who advised the natural mother that she had the money. The mother declined to come after the money and the [grandmother] refused to take it to her. Friction and a misunderstanding arose between the child’s parents and their parents.
“We do not construe the conduct of the father to evince a settled purpose to [forgo] all parental duties and relinquish all parental claims to the child. The father’s failure to comply with the order for support of the child, under the circumstances here presented, and his failure to visit the child under existing misunderstandings in the family, does not, in our judgment, constitute abandonment within the purview of Section 3, Title 27, Code of 1940.”
281 Ala. at 394, 203 So.2d at 115-16 (citation omitted). Similarly, we cannot construe the conduct of the father in this case “to evince a settled purpose to [forgo] all parental duties and relinquish all parental claims” to his daughter.

Withdrawal of Consent

In addition, even if a period of several months passed during which the father did not attempt to maintain a significant parental relationship with his daughter, that failure did not continue, and the trial court could not reasonably infer from the father’s conduct that he was impliedly consenting to the adoption of his daughter at the time of trial.[7] To the contrary, the father’s actions since December 1998 may be viewed as a “withdrawal” of consent, even assuming for the sake of argument that consent could have been inferred from earlier conduct. See Ex parte C.V., 810 So.2d at 703, 705, 718-19 (Moore, C.J., and See and Johnstone, JJ., concurring specially in separate opinions) (each expressing his opinion that an implied consent to adoption can be withdrawn).
The mother and the stepfather argue, however, that Alabama’s Adoption Code expressly prescribes a formal mechanism for the withdrawal of a formal, express consent to adoption, but does not so provide for the withdrawal of an implied consent. They urge this court to conclude, therefore, that the Legislature did not intend that an implied consent could be withdrawn. We begin our review of this issue by noting that it stands to reason that a consent given expressly, particularly one given in writing in accordance with a formal, statutorily prescribed mechanism, may be, and must be, withdrawn expressly — and that therefore our Legislature logically prescribed a corresponding formal, written mechanism for such a withdrawal. See § 26-10A-14, Ala.Code 1975.
Fashioning a statutory rule or mechanism for withdrawing an implied consent would be much more problematic, however. Whether, and at what point, a father’s (or a mother’s) shortcomings in regard to maintaining a relationship with his (or her) child would be considered sufficient to amount to an implied consent to the adoption of that child by another would almost *343 always be uncertain. In such cases, it is commonly not until the notion of an implied consent has been raised by another party in a petition for adoption that the father has any awareness that someone might construe his actions as implying consent to the adoption of his child. Even a father who is unusually objective would likely not be aware, and in any event could not be sure, at what point in his interaction with his child and his former wife his conduct might be considered an implied consent for some other man to adopt his child; therefore, the father would not know when, and in most cases would not know how, he should be about the business of “withdrawing” that consent. Whether and when a consent that is merely implied from conduct comes into existence is with any real certainty known only after the fact, when a court with the advantage of retrospection makes those determinations. It therefore is not surprising, nor particularly instructive, that the Legislature did not attempt, as it did for formal, express consents, to fashion some sort of rule or mechanism for the withdrawal of implied consents. We do not interpret the Legislature’s omission in this regard as an indication of legislative intent that such withdrawals may not occur.[8]
Adoption and the rights under the Alabama Adoption Code are in derogation of common law and in derogation of the rights of natural parents,, and are therefore to be strictly construed. Abney v. DeLoach, 84 Ala. 393, 4 So. 757 (1888) (right of adoption is purely statutory and *344 did not exist in Alabama before the adoption of the 1852 Code except with respect to the legitimation of bastard children); Holcomb v. Bomar, 392 So.2d 1204 (Ala.Civ.App.1981); Straszewicz v. Gallman, 342 So.2d 1322 (Ala.Civ.App.1977).
“ ‘The adoption of a child was a proceeding unknown to the common law. The transfer of the natural right of the parents to their children was against its policy and repugnant to its principles. It had its origin in the civil law and exists ... only by virtue of the statute which ... expressly prescribes the conditions under which adoption may be legally effected.
“ ‘Consent lies at the foundation of statutes of adoption, and under our law this consent is made absolutely essential to confer jurisdiction on the ... court to make an order of adoption, unless the conditions ... exist specially provided by the statute itself and which render such consent of the parents unnecessary. Unless such consent is given, or, for the exceptional causes expressly enumerated is dispensed with, the court has no jurisdiction in the matter.... The power of the court in adoption proceedings to deprive a parent of his child being in derogation of his natural right to it, and being a special power conferred by the statute, such statute must be strictly construed, and in order to warrant the exercise of the special power ... in opposition to the wishes and against the consent of the natural parent, on the ground that conditions prescribed by statute exist which make that consent unnecessary, the existence of such conditions must be clearly proven ... if the statute is open to construction and interpretation, it should be construed in support of the right of the natural parent.’ ”
McGowen v. Smith, 264 Ala. 303, 305, 87 So.2d 429, 430-31 (1956) (quoting In re Cozza, 163 Cal. 514, 522-24, 126 P. 161, 164-65 (1912)).
Consistent with the strict construction of adoption statutes and the concomitant concern with the rights of natural parents, until recent years, most states that considered the issue permitted revocation or withdrawal of consent up until the time of the final decree of adoption. In other words, the birth parent’s continuing consent was necessary for the final adoption. For example, in Green v. Paul, 212 La. 337, 31 So.2d 819 (1947), a Louisiana court held that consent must be obtained throughout the proceeding, and that withdrawal of consent at any stage of the adoption proceeding was tantamount to consent never given. 31 So.2d at 819. See also, e.g., Small v. Andrews, 20 Or.App. 6, 530 P.2d 540 (1975) (explaining that, until 1946, natural parents in Oregon were absolutely entitled to withdraw consent before entry of adoption decree); Commonwealth v. Marhoefer, 375 Pa. 1, 99 A.2d 276, 280 (1953) (natural parents have an absolute right to revoke consent). See generally, e.g., Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) (parent’s right to custody and control of one’s child is a fundamental interest guaranteed by the United States Constitution). Any withdrawal of consent before an adoption was finalized effectively returned the child to the care and custody of the birth parents.
In Alabama, however, our courts have not adopted the view that any withdrawal of consent before an adoption is finalized effectively returns the child to the care and custody of the birth parents. Instead, since at least 1918, our appellate courts have followed a case-by-case approach with an emphasis on the best interests of the child.
*345 In McClure v. Williams, 201 Ala. 499, 78 So. 853 (1918), the natural parents sought to annul a declaration of adoption by the probate court and to have the child returned to his natural parents. Although it affirmed the adoption decree, the Supreme Court explained that the trial court, had it seen fit to do so, had the discretion to allow the natural parents, in effect, to withdraw their consent to the adoption:
“In every case involving such issues the court, having due regard for that parental love which covers a multitude of shortcomings, is clothed with a sound discretion to grant or refuse relief as the best interest of the infant may demand .... [AJppellees have adopted the child in this case by a formal proceeding in the probate court under section 5202 of the Code. Nevertheless, the court of equity, its jurisdiction being properly invoked, exercises a free discretion in disposing of the child for its own benefit and welfare.”
201 Ala. at 499, 78 So. at 853 (citation omitted).
Although McClure v. Williams and the other cases discussed below appear to have involved express consents, it should be noted that, before the adoption of § 26-10A-9 in 1990, there was no separate statutory provision in Alabama providing for implied consents to adoptions. Even more significantly, the opinions in these cases applied consent statutes that were silent as to whether consent, once given, could be withdrawn. Similarly, § 26-10A-9, which now specifically provides for implied consents, is silent as to whether this consent, once given, may be withdrawn. The Supreme Court in Williams v. Pope, 281 Ala. 416, 203 So.2d 271 (1967), analyzed the issue before it as follows:
“Title 27, § 3, Code 1940, requires consent of parents for adoption except in certain cases, but our statutes are silent as to the revocation of consent.
“In 2 Am.Jur., Adoption, § 46, p. 897, we find:
“ ‘In many jurisdictions the right of a parent to withdraw a consent to the adoption of a child is controlled and limited by the provisions of the adoption statutes themselves, and aside from express statutory provisions the trend of modern authority is toward the position that a parent who has freely and knowingly given the requisite consent to the adoption of his or her child cannot, after that consent has been acted upon by the adoptive parents by bringing adoption proceedings, withdraw that consent arbitrarily or as of right so as to bar the court from decreeing adoption. This is particularly true where, in reliance upon such consent, the proposed adopting parents have taken the child into their custody and care for a substantial period of time and bonds of affection have been forged between them and the child.’
“To like effect, see 2 C.J.S. Adoption of Children § 21(4), pocket part note 15.1; annotation 156 A.L.R. 1011. We quote the following from In re Holman’s Adoption, 80 Ariz. 201, 295 P.2d 372, 376 [(1956)] ...:
“ ‘... In view of our holding ... that the best interest of the child is the paramount consideration ... we hold that a consent once given by the parent or other persons having the authority to give such a consent, may not be revoked after the child has been placed in the possession of the adoption parents except for legal cause shewn [ (emphasis original) ], as where such consent was procured through fraud, undue influence, coercion, or other improper methods. *346 Provided always, however, that the comí may permit said revocation where upon hearing, it is shown that it will be for the best interest of the child that it be returned to its natural parents’ ”
281 Ala. at 420-21, 203 So.2d at 275 (emphasis added except as noted otherwise).
Likewise, in Davis v. Turner, 337 So.2d 355 (Ala.Civ.App.1976), this court concluded that whether a parent could revoke a previously given consent was a decision for the eoui’t to make on a case-by-case basis, based upon the child’s welfare. The court began its analysis by recognizing that
“[a]doption is not merely an arrangement between a natural and adoptive parents, but is a status created by the state acting as parents patriae, the sovereign parent....
“Under the Alabama statute it is the state’s sovereign power, manifested by court decree, which brings the adoption to pass. The consent of the natural parent is not the instrument of adoption: rather, the giving of consent at some point is one of the prerequisites to the probate court’s consideration of the subject matter.”
337 So.2d at 360-61. The court then proceeded to explain that, once given, the withdrawal of the “jurisdictional prerequisite” of parental consent can have a different effect on the court’s jurisdiction depending on both the timing and the circumstances of the attempted withdrawal. Specifically, where the jurisdictional prerequisite of parental consent remains in place at the time of the judgment, the judgment consummates the adoption and a later withdrawal of consent has no effect. Id. at 361. Conversely, where a required consent has never been given, the trial court never obtains jurisdiction to proceed to “the paramount question of the child’s welfare.” Id.
In Davis v. Turner, however, as in the present case, the natural parent gave consent, but attempted to repudiate that consent before rendition of a judgment of adoption. As this court explained, there is a split of authority as to the efficacy of such an attempted repudiation of consent:
“There is a split of authority among those states which have dealt with this problem. One line of cases holds that consent must continue up until the rendition of the decree or the trial court loses jurisdiction, In re Adoption of Schult, 14 N.J.Super. 587, 82 A.2d 491 [(1951)]; In re Adoption of Susko, 363 Pa. 78, 69 A.2d 132 [(1949)]; In re Adoption of McKinzie, 275 S.W.2d 365 [(Mo.Ct.App.1955)]. The other line of decisions holds that jurisdiction attaches with the initial manifestation of consent and remains in spite of attempted repudiation of consent, Walter v. August, 186 Cal.App.2d 395, 8 Cal.Rptr. 778 (1960). This latter line of cases likens adoption to an in rem proceeding, analogous to divorce. The natural parent’s initial consent followed by placement of the child with the adoptive parents creates a res, a preadoptive relationship, over which the trial court maintains jurisdiction until adoption is finally decreed or denied. Since it is this res, not the consent agreement per se, which furnishes jurisdiction, repudiation of consent does not withdraw jurisdiction. By keeping jurisdiction, the trial court is fully able to inquire into the best interests of the child.
“In light of the unique features of Alabama’s adoption statute, the in rem approach to jurisdiction is more appropriate. Jurisdiction attaches with the initial acknowledgement of consent by the natural parent, and, once the child is placed, remains despite attempts at rev *347 ocation, so long as the child’s welfare is thereby furthered.”
337 So.2d at 355 (emphasis added).
In Graves v. Graves, 51 Ala.App. 601, 288 So.2d 142 (Ala.Civ.App.1973), this court allowed a natural mother to withdraw her previously given written consent for the adoption of her child, and revoked a prior interlocutory order of adoption. It did so even though the consent for adoption given by the mother was not obtained by undue influence, coercion, fraud, or other improper methods. 51 Ala.App. at 602-03, 288 So.2d at 143-44. Instead, the trial court’s order was based on “its finding that in the court’s opinion the best interest of the child ultimately would be served by returning her to her mother-appellee.” 51 Ala.App. at 603, 288 So.2d at 143. This court affirmed the trial court’s action, explaining that the affirmance “should in no way be interpreted as encroaching on the integrity of our adoption system, but our action is limited to the particular facts- of this case. We take note of the family relationship of the parties, particularly their joint role in the life of the child and, further, that no order of final adoption had been entered.” 51 Ala.App. at 604, 288 So.2d at 144.
In In re Miller, 473 So.2d 1069, 1070 (Ala.Civ.App.1985), this court allowed a mother to revoke her consent to the adoption of her three young children. The mother signed written consents for the adoption of each child by a different married couple, and physical custody of each child was transferred to his or her adoptive parents.' Approximately four months later, the mother filed with the trial court three documents whereby she attempted to revoke her consent to each child’s adoption. Although there was not sufficient evidence to show that the mother’s consent was void ab initio (i.e., because of fraud, undue influence, coercion, etc.), this court concluded that the trial court was not plainly and palpably wrong in concluding that the best interests of the children would be served by allowing revocation of the consents. 473 So.2d at 1071.
In Ex parte Fowler, 564 So.2d 962 (Ala.1990), the Alabama Supreme Court stated both the rule regarding revocation of parental consent and the reason behind it, by quoting from In re Miller:
“ ‘The rule in Alabama is that, once a valid consent to adopt has been given and the child has been placed in the custody of the adoptive parents, consent can only be revoked for legal cause, such as where the consent was procured through fraud, undue influence, coercion, or other improper methods or where, under all the circumstances, the trial court finds it to be in the best interest of the child for it to be returned to the natural parents. Ex parte Nice, 429 So.2d 265 (Ala.1982), appeal after remand, Shuttleworth v. Catholic Family Services, 439 So.2d 1292 (Ala.Civ.App.1983); Williams v. Pope, 281 Ala. 416, 203 So.2d 271 (1967), appeal after remand, 284 Ala. 456, 225 So.2d 861 (1969) (citing In re Holman’s Adoption, 80 Ariz. 201, 295 P.2d 372 (1956); Lawshe [v. Seals], 443 So.2d 1249 [Ala.Civ.App.1983]; Wolf v. Smith, 435 So.2d 749 (Ala.Civ.App.1983); Hanlon v. Mooney, 407 So.2d 554 (Ala.Civ.App.), rev’d on other grounds, 407 So.2d 559 (Ala.1981); Davis v. Turner, 337 So.2d 355 (Ala.Civ.App.1976); Graves v. Graves, 51 Ala.App. 601, 288 So.2d 142 (Ala.Civ.App.1973)).’
“The wisdom behind that rule is self evident. If a natural parent has freely and knowingly given the requisite consent to the adoption of his or her child, and that consent has been acted upon by *348 the adopting parents by their commencing adoption proceedings, and if the proposed adopting parents have relied on that consent by taking the child into their custody and care for a substantial period of time and, especially if bonds of affection have been forged between them and the child, then to allow the natural parent to revoke his or her consent because he or she had a change of mind would create a great hardship for the child, for the adopting parents, and for the field of child adoption in general. See 2 Am.Jur.2d Adoption § 46 (1962).”
564 So.2d at 965 (quoting In re Miller, 473 So.2d at 1070) (emphasis added). Compare Small v. Andrews, 20 Or.App. at 11-12, 530 P.2d at 543 (describing factors, such as length of time and conduct of parties between the giving of consent and the attempted withdrawal, to be considered by trial court in deciding whether natural parent is estopped from revoking consent).
The rule followed by our Supreme Court and this court in Williams v. Pope, In re Miller, Ex parte Fowler, and the other eases discussed above is, indeed, well reasoned. Moreover, the “wisdom behind that rule” applies with equal force to the withdrawal of express consents and to the withdrawal of implied consents. We therefore hold that that rule applies to the latter, as well as the former. Thus, the withdrawal of an implied consent to adoption is not allowed as a matter of right in all cases, nor is it disallowed as a matter of law in all cases. Instead, once a valid consent to adopt has been given and the child has been placed in the custody of the adoptive parents, jurisdiction remains with the trial court so long as the child’s welfare is thereby furthered. Consent may be revoked, however, either for legal cause, such as where the consent was procured through fraud, undue influence, coercion, or other improper methods, or where, under all of the circumstances of a given case, the trial court finds it to be in the best interests of the child for the child to be returned to the natural parent or parents.
With respect to those cases that will be decided not based upon “legal cause,” but based upon the “best-interests-of-the-child” standard, we note that our law has long recognized strong presumption in favor of custody in the natural parents. See, e.g., Griggs v. Barnes, 262 Ala. 357, 78 So.2d 910 (1955).[9] Consistent *349 with such presumptions, our Supreme Court stated in McClure v. Williams, 201 Ala. 499, 78 So. 853 (1918), that the trial court’s “sound discretion to grant or refuse relief [from a consent to adoption] as the best interests of the infant may demand” is to be exercised “[i]n every case [with] due regard for the parental love which covers a multitude of shortcomings.” 201 Ala. at 499, 78 So. at 853. However, consistent with our Supreme Court’s holding in Ex parte Fowler, in those cases where a natural parent has “freely and knowingly” engaged in conduct from which his or her consent to adoption is implied and the adopting parents reasonably have “relied upon [that conduct] by taking the child into their custody and care for a substantial period of time ..., especially if bonds of affection have been forged between' them and the child,” the court must weigh against the presumption in favor of the natural parents the hardship for the child (and to a lesser extent the adopting parents) that would be created by breaking those bonds.
In eschewing a more mechanical approach to such cases, we recognize that the decisions to be made by the trial courts of this state- will not always be easy. Nonetheless, we believe the approach we recognize today to be not only required by our statutes and precedents, but also to be the approach that will best protect the interests of all parties involved, particularly the interests of the child, in any given case. The trial courts of this state are called upon almost daily to make “Solomon-like” decisions regarding custody, adoption, termination of parental rights, and other issues that determine the fate of children. We have great confidence in the wisdom that the trial courts bring to bear on such issues. As this court stated specifically in Davis v. Turner in regard to the issue of revocation of consents to adoption, “[T]he trial court is fully able to inquire into the best interests of the child” on a case-by-case basis.
Our holding today also is supported by a closer examination of several aspects of Alabama’s Adoption Code. First, §§ 26-10-13 and -14, read in pari materia with one another, may fairly be read not as creating the right to withdraw a consent to adoption—since that right existed at common law—but as restricting the time (the 5-day, the 14-day, and the 1-year limitations included in these statutes) and the manner (§ 26-10A-14 requires the use of the form prescribed in § 26-10A-12 for a withdrawal within 5 days) of withdrawal. The Adoption Code contains no such restrictions relating to the withdrawal of implied consents. In light of the requirement that we construe the Adoption Code narrowly, as it is in derogation of the common law and represents a curtailment of the rights of natural parents, we do not construe the absence of such provisions relating to the withdrawal of implied consents as an indication of legislative intent that such consents cannot be withdrawn.
Second, and perhaps most significantly, the fact that implied consents, like express consents, may be withdrawn under appropriate circumstances seems unavoidable in light of the language of § 26-10A-24(a)(4) and § 26-10A-24(d)(4), Ala.Code 1975. These statutory provisions-expressly provide that “a consent or relinquishment may be withdrawn.” There is no restriction of these provisions to express consents or relinquishments. Indeed, to the contrary, § 26-10A-24(a)(3), with which § 26-10A-24(a)(4) and -24(d)(4) must be read in- pari materia, indicates that the Legislature is addressing “an actual or implied consent or relinquishment” when it addresses the issue of withdrawal in the latter sections.
*350 Finally, we note that the Legislature has demonstrated that when it intends for an implied consent to adoption be “irrevocable,” it can expressly provide for such irre-vocability. Section 26 — 10C—l(i), Ala.Code 1975, expressly provides that a natural father who fails to register in the Putative Father Registry Act before or within 30 days of the birth of a child born out of wedlock “shall be deemed to have given an irrevocable implied consent in any adoption proceeding.” (Emphasis added.) Given the history of adoption law in this state, the requirement that we narrowly construe our adoption statutes as being in derogation of the common law and of the rights of natural parents, and the fact that consents were revocable in Alabama under well-formulated principles — principles that reflect sound equitable considerations — until further restrictions applicable only to express consents were adopted by our Legislature in 1990, we will not take it upon ourselves to declare irrevocable, as a matter of law and in all cases, that which the Legislature has not chosen to declare irrevocable.
Turning our attention now to the record in the present case, given the history of the parties’ relationships (particularly that of the father and his daughter) and the circumstances concerning the breakdown in communication and contact between the father and his daughter, we do not find in the record substantial evidence that any reliance by the stepfather on any alleged consent by the father would have been reasonable. Indeed, it cannot be said that any such reliance, whether reasonable or not, actually occurred; the custody of the daughter did not change in reliance upon the alleged implied consent in the manner contemplated in Ex parte Fowler. The daughter in this case was already living with the stepfather, and had been for many years.
Nor is there substantial evidence that, in reliance on the alleged consent, bonds of affection were forged between the daughter and the stepfather. The trial court apparently considered the father’s consent to have been implied after six months of the nine-month period in 1998 during which the father had no contact with the daughter and provided little or no financial support. At most, therefore, only approximately three months passed from the time of the alleged consent to the time the father learned of the stepfather’s position, at which point the father immediately took steps that made it clear that he did not consent to an adoption. There is no evidence that, during this relatively short three-month span in the life of this 14-year-old child, the child formed any bonds with the stepfather that were not already in existence or that would not otherwise have been in existence.
Further, based on our review of the record as a whole, we conclude that substantial evidence does not support the conclusion that it would serve the child’s best interests and welfare to forever sever her relationship with her natural father by not allowing the father to withdraw the alleged consent. At the risk of suggesting that our conclusion in this regard is limited to the following facts, we reiterate that the daughter was 14 years old at the time of the trial and that the father had been integrally involved in her life almost all of those 14 years. Concomitantly, there is no question in this case as to the father’s love for his child or his fervent desire to resume and maintain a normal relationship with her. In the context of this case, that “normal relationship” is not one of primary custodian, but of a noncustodial parent with visitation rights. Whether the adoption occurs or not, the child will continue to experience on a daily basis whatever benefits there may be from living with the *351 prospective adopting parent, her stepfather. Conversely, the biggest changes for daughter and father, alike, if the adoption is granted, will be to cut off the natural father’s periodic, but limited, visitation with his daughter, and the payment of child support. Thus, even if the father’s conduct were sufficient to imply his consent at one time to his daughter’s adoption, we do not believe there is sufficient evidence in the record in this case to support a conclusion that the child’s best interests would be served by not allowing her father to withdraw that consent.
Based on the foregoing, the judgment of the trial court is reversed, and this cause is remanded for the entry of a judgment consistent with this opinion.
REVERSED AND REMANDED WITH INSTRUCTIONS.
PITTMAN, J., concurs.
YATES, P.J., and CRAWLEY and THOMPSON, JJ., concur in the result.

. Cf. Brown v. Alabama Dep't of Pensions & Sec., 473 So.2d 533, 534-35 (Ala.Civ.App.1985) (noting that Alabama’s Child Protection Act (Ala.Code 1975, § 26-18-1 et seq.) enumerates only some of the factors that have long been taken into consideration in deciding parental-rights-termination cases and that among other factors emphasized have been the conduct of the parents toward the child and the parents' love of, and interest in, the child).

. The adoption proceeding appears to represent a continuation of that strife between the mother and the father. The mother joined the stepfather's petition. Most of the testimony in the three hearings in this case came from the mother and the father. The stepfather did not testify in the initial hearing.

. Because consent to adoption entails a consent to termination of parental rights, a court's finding that a parent’s conduct implies such consent arguably must be based upon “clear and convincing” evidence in order to satisfy due process requirements. See Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). As the United States Supreme Court and this court have recognized, a parent has a fundamental liberty interest in the care, custody, and management of his or her child. See, e.g., Santosky v. Kramer; Prince v. Massachusetts, 321 U.S. 158, 166, 64 S.Ct. 438, 88 L.Ed. 645 (1944); Meyer v. Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042 (1923); Skinner v. Oklahoma, 316 U.S. 535, 541, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942); J.S. v. D.W., 835 So.2d 174 (Ala.Civ.App.2001). Thus, while the paramount concern in cases involving the termination of parental rights is the welfare and best interests of the children, it is appropriate "at the same time to protect the rights of their parents.” Ex parte Beasley, 564 So.2d 950, 952 (Ala.1990). "[A] court should terminate parental rights only in the most egregious of circumstances.” Ex parte C.V., 810 So.2d 700, 720 (Ala.2001) (Johnstone, J., concurring specially, and quoting Ex parte Beasley, 564 So.2d 950, 952 (Ala.1990) (relating to termination of parental rights under Alabama's Child Protection Act)).

. The father gave the following testimony regarding his conduct:
*340 "Q. The complaints they’ve made against you, do you believe them to be justified?
"A. No, I do not. I made a mistake. I should have never quit paying my child support, I admit to that. But it was done sort of in a spite.
"Q. Spite against the child or spite against the ex-wife?
"A. Spite against my ex-wife, because she wouldn't let me see the child. And that was the only reason. I never would have abandoned my child at all in any way, fashion, or form.
"Q. And then prior to that time, for all those years, you continuously had a regular relationship with the child?
"A. Yes, I had...."

. The original Comment referenced "subdivision (2),” which became subdivision (3) with the adoption of certain amendments in 1999. See Act No. 99-435, Ala. Acts 1999.

. Since the adoption of § 26-1OA-9 and the publication of the Comment, the Alabama Child Protection Act has been amended so as to change from six months to four months the time necessary to give rise to the presumption under that Act. Specifically, § 26-18-7(c) now provides that "where the parents have abandoned a child and such abandonment continues for a period of four months next preceding the filing of the petition, such facts shall constitute a rebuttable presumption that the parents are unable or unwilling to act as parents” for purposes of satisfying the requirements under § 26-18-7(a) of that Act.

. Cf. Adkison v. Adkison, 286 Ala. 306, 239 So.2d 562 (1970) (father who was previously found to have abandoned child at one time, but who thereafter made court-ordered child support payments and exercised visitation rights did not continue in a state of "abandonment” at the time of child's death for purpose of statutory wrongful-death claim).

. What the Legislature has done, however, is adopt a statutory scheme that clearly contemplates that a valid consent to an adoption, whether express or implied, will be in effect at the time of the adoption. See §§ 26-10A-3; - 7(a); -13; -14(a). and (e); -24(a)(3) and (4); and -24(d)(3) and (4), Ala.Code 1975. See also Ex parte C.V., 810 So.2d at 703, 705, 718-19 (Moore, C.J., and See and Johnstone, JJ., concurring specially). See generally Ex parte S.C.W., 826 So.2d 844 (Ala.2001) (in interpreting a statute, a court does not look at one provision in isolation, but rather looks to a whole statutory scheme for clarification and contextual reference). This requirement is in lieu of the requirement under the Child Protection Act that one of the two parental-rights-termination grounds stated in § 26-18-7 be extant at the time of trial. See § 26-10A-10(a), Ala.Code 1975 (consent under the Adoption Code is not necessary if there is a termination of parental rights under the Child Protection Act); Ex parte C.V., 810 So.2d at 704 (See, J., concurring specially).
Sections 26-10A-7, -13, and -14 work together in an adoption based on a natural parent's express consent to require that the consent remain in effect at the time of the adoption. The conclusion that the Legislature also contemplated that, when an adoption is based on an implied consent, that consent likewise must be in effect at the time of the adoption is supported by the fact that it is the “consent required by § 26-10A-7 [that] may be implied” under § 26-1 OA-9. Further, the Comment to § 26-1 OA-9 states that an implied consent was intended as a substitute “when it is not possible to obtain the actual consent of a person who is specified in § 26-10A-7.”
Moreover, § 26-10A-24(a)(3) allows for the contest of an adoption resulting from either "an actual or implied consent or relinquishment” based on whether, at the time of the contested hearing, the "actual or implied consent or relinquishment to the adoption is valid.” (Emphasis added.) Likewise, § 26-10A-24(d)(3) expressly provides that an adoption proceeding shall be dismissed if, at the time of the contested hearing, the “necessary consent cannot be obtained or is invalid.” (Emphasis added.)
Furthermore, as discussed in the text, infra, § 26-10A-24(a)(4), which by its terms refers merely to "a consent or relinquishment" but which must be read in pan materia with the immediately preceding § 26-10A-24(a)(3) (which refers to "an actual or implied consent or relinquishment”), contemplates that an adoption is contestable over the issue of whether the consent or relinquishment “may be withdrawn.” Section 26-10A-24(d)(4) provides for the dismissal of an adoption proceeding if the court determines that such a consent or relinquishment “may be withdrawn.”

. Our Supreme Court explained in Chandler v. Whatley, 238 Ala. 206, 189 So. 751 (1939), that:
" 'The law devolves the custody of infant children upon their parents, not so much upon the ground of natural right in the latter, as because the interests of the children, and the good of the public will, as a general rule, be thereby promoted. It is a fair presumption, that so long as children are under the control of their parents, they will be treated with affection, and their education and morals will be duly cared for....
'... So strong is the presumption, that "the care which is prompted by the parental instinct, and responded to by filial affection, is most valuable of all”; and so great is the reluctance of the court to separate a child of tender years from those who according to the ordinary laws of human nature, must feel the greatest affection for it, and take the deepest interest in its welfare — that the parental authority will not be interfered with, except in case of gross misconduct or where, from some other cause, the parent wants either the capacity or the means for the proper nurture and training of the child. Where a contest for the custody of a child arises between its father or mother and a third person, the superior claim of the parent ought not, in our opinion, to be disturbed, unless it plainly appears that the interests of the child require it to be set aside.’ "
238 Ala. at 208-09, 189 So. at 753 (citations omitted; quoting Striplin v. Ware, 36 Ala. 87, 89-90 (1860)).